UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

      -v-                                :
                                              S3 09 Cr. 581 (WHP)
PAUL M. DAUGERDAS,                :
DONNA GUERIN,
DENIS FIELD, and                  :
DAVID PARSE,
                                   :
            Defendants.
                                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S POST-HEARING MEMORANDUM OF LAW IN REPLY TO DEFENDANTS' POST-HEARING MEMORANDA

**PREET BHARARA**
**United States Attorney for the Southern**
**District of New York**
**Attorney for the United States of America**

**STANLEY J. OKULA, JR.,**
**NANETTE L. DAVIS,**
**JASON P. HERNANDEZ,**
**Assistant United States Attorneys**

    – Of Counsel –

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.      THE DEFENDANTS HAVE FAILED TO ESTABLISH BIAS
          ON THE PART OF JUROR CATHERINE CONRAD . . . . . . . . . . . . . . . . . . . . . . 3

          A.      Conrad's Testimony Revealed No Bias . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

          B.      Truthful Answers During Voir Dire Would Not Have
                Mandated Conrad's Removal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          C.      The Defendants' Challenge to Conrad's Psychological
                Competence is Frivolous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    II.     PARSE HAS WAIVED ANY RIGHT TO CHALLENGE THE
          JURY VERDICT BASED ON CONRAD'S MISCONDUCT . . . . . . . . . . . . . . 10

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

# TABLE OF AUTHORITIES

## CASES

Anderson v. Miller, 346 F.3d 315 (2d Cir. 2003) ...................................................................9

Dennis v. Mitchell, 68 F. Supp. 2d 863 (N.D. Ohio 1999) ......................................................8

Swain v. Alabama, 380 U.S. 202 (1965) ................................................................................8

United States v. Annigoni, 96 F.3d 1132 (9th Cir. 1996) .......................................................8

United States v. Columbo, 869 F.2d 149 (2d Cir. 1989) ........................................................8

United States v. Dioguardi, 492 F.2d 70 (2d Cir. 1974) ........................................................9

United States v. Greer, 285 F.3d 158 (2d Cir. 2002) .............................................................9

United States v. Langford, 990 F.3d 65 (2d Cir. 1993) .........................................................9

United States v . Lawes, 292 F.3d 123 (2d Cir. 2002) .........................................................11

United States v. Owen, 500 F.3d 83 (2d Cir. 2007) .............................................................10

United States v. Pickard, Nos. 00-40104-01 & 02 RDR, 2004 WL 3186232
    (D. Kan. 2004) .................................................................................................................8

United States v. Plitman, 194 F.3d 59 (2d Cir. 1999) ..........................................................11

United States v. Stewart, 433 F.3d 273 (2d Cir. 2006) ..........................................................8

## STATUTES

Federal Rules of Criminal Procedure, Rule 33             ................................................10, 11

Federal Rules of Criminal Procedure, Rule 33(a)          ..........................................................1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| -v- | : |
| | S3 09 Cr. 581 (WHP) |
| PAUL M. DAUGERDAS, | : |
| DONNA GUERIN, | |
| DENIS FIELD, and | : |
| DAVID PARSE, | |
| | : |
| **Defendants.** | |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## PRELIMINARY STATEMENT

The United States respectfully submits this memorandum in response to the post-hearing memoranda submitted by defendants Paul Daugerdas, Donna Guerin, Denis Field, and David Parse (hereinafter "the Defendants"), in connection with their motion for a new trial pursuant to Rule 33(a) of the Federal Rules of Criminal Procedure.

Try as they might, the Defendants have failed to demonstrate either actual bias or implied bias on behalf of juror Catherine M. Conrad. Under the governing Supreme Court and Second Circuit authority, this failure dooms their new trial motion, as "demonstrated bias" is an essential element of any juror misconduct claim. Aside from their wholly unsupported and legally untenable suggestions that Conrad was psychologically unfit to serve on the jury, the Defendants' claim at bottom is that Conrad's pattern of false statements is sufficient to prove bias. The Defendants are wrong on the facts and the law. The Second Circuit has made clear — in cases the Defendants ignore in the post-hearing brief — that lies, standing alone, are insufficient to establish a finding of bias.

This is not to say that Conrad did not engage in dishonest conduct unbecoming of a responsible citizen and a member of the New York Bar. But dishonest conduct by a juror does not automatically equate with constitutionally impermissible bias, and the Defendants did not establish that it does so equate here. Indeed, despite the opportunities given in the initial briefing, at the factual hearing, and in their post-hearing memorandum, the Defendants have still refused even to recognize, much less explain persuasively, how a supposedly biased Catherine Conrad could render the split verdict she did — acquitting defendant Raymond Craig Brubaker (a lawyer) and partially acquitting defendant David Parse. In short, the Defendants' challenge fails because they have failed to show bias.

Defendant David Parse's motion should be denied on the separate ground that he waived any right to level a post-verdict challenge to Conrad. In an effort to avoid a waiver finding, Parse ignores the legal standard, and wrongly claims that no waiver can be found unless the Court concludes that the Brune & Richard attorneys lied under oath. Parse is wrong. Even if one were to credit that testimony in full, the record is unequivocal that the Brune & Richard attorneys failed to exercise reasonable diligence with respect to the Conrad information, warranting a finding of waiver on that basis alone.

In addition, Parse is simply wrong in maintaining that Brune & Richard attorney Theresa Trzaskoma lacked knowledge of Conrad's status prior to the verdict. Trzaskoma's statements ("Jesus, I do think that it's her!"), the documentary information in her hands (two Appellate Division suspension orders, and the information-rich Westlaw report), and her post-actions — including factual misstatements about the Brune & Richard attorneys' knowledge of Conrad's status made to the Court both orally and in the Brune & Richard brief — all support the conclusion that Trzaskoma

had knowledge of Conrad's status as a suspended attorney. In sum, the objective facts fully support a finding of waiver.

## ARGUMENT

**I.    THE DEFENDANTS HAVE FAILED TO ESTABLISH BIAS ON THE PART OF JUROR CATHERINE CONRAD**

    **A.    Conrad's Testimony Revealed No Bias**.

As we recounted in our initial post-hearing brief, while Conrad's testimony at the Hearing revealed the numerous false statements she made in order to serve on the jury, that same testimony — supported compellingly by the verdict she eventually rendered — revealed absolutely no bias.

In a desperate attempt to advance their claim, the Defendants have attempted to recast portions of Conrad's testimony as evidence of bias, even when a fair reading of the record does not support it.[1] For example, the Defendants take Conrad's statement that she lied to make herself more marketable to the jury (Tr. 153, 209), and argue that Conrad lied to make herself more marketable to the Government. (Def. Post-Hearing Br. 8). Conrad, however, never testified that she wanted to make herself more marketable to any particular party and the record does not support the inference the Defendants ask the Court to draw. Indeed, many of the lies would suggest bias in favor of the Defendants and against the Government.

The Defendants have also tried unconvincingly to convert several of Conrad's answers at the Hearing into proof of bias, although Conrad could not possibly hold all of the beliefs ascribed to her at once. On the one hand, the Defendants argue that Conrad was biased against the defendants because she believed that all lawyers are crooks. (Def. Post-Hearing Br. 8-10). On the other hand,

---

[1] See Memorandum in Further Support of Motion by Defendants for a New Trial Based on the Misconduct of Juror No. 1 ("Def. Post-Hearing Br.").

3

the Defendants claim that Conrad lied to conceal the fact that she would not be a good juror for the Government — in other words, biased <u>against the Government</u> — because she is married to someone with a criminal record. (Def. Post-Hearing Br. 8) (quoting Tr. 229 ("Q: You told yourself at the time that it was OK from the defendants' perspective because, if anything, somebody who was married to a criminal would tend to favor other criminals, right? A: I guess it can be characterized as that.")). In their zeal to find bias where there is none, the Defendants thus claim that Conrad was simultaneously biased against the Defendants <u>and</u> the Government. Conrad, of course, never admitted that she was biased against any party and the inferences that the Defendants ask the Court to draw are unsupported by Conrad's testimony.

To take another example, it is clear that Conrad was speaking hypothetically when she stated that the Defendants might want her as a juror because of her husband's criminal history. (Tr. 229:10-13 ("Yes, to be taken in the context of, if anything, one would think I would have been biased towards the defendants, in favor of the defendants, which I was not, either the prosecution or the defense. I was unbiased.")). During cross-examination, however, Conrad was asked to speculate about what defense counsel might have thought about her if Conrad had answered questions honestly during voir dire. Conrad replied that, "I would think the defense counsel would be wild to have me." (Tr. 210:18). Conrad further clarified what she meant: "Well, my husband seems to be a professional defendant, so I probably would have in their mind been a keeper for their side."[2] (Tr. 210: 20-21). Conrad made it clear that such a supposition was incorrect because she was not in favor of either party. (Tr. 229:10-13).

---

[2] Conrad apparently did not know the extent of her husband's criminal history until the Hearing. (Tr. 206 "Mr. Gair was asking me things about my husband that I am finding out right now today.").

4

The Defendants go too far when they suggest that Conrad prejudged the defendants who were lawyers. In sweeping fashion, the Defendants argue that because Conrad's legal career was a professional and financial failure, she harbored an animus against all lawyers. In the midst of a heated exchange on cross-examination, Conrad was asked, "Your husband is a career criminal, right?" In response, Conrad huffed, "So are most attorneys." (Tr. 148). From this exchange, the Defendants argue that Conrad's response is proof that she prejudged the defendants who were lawyers.

But a fair reading of Conrad's answer — prompted by an in-your-face series of questions by Daugerdas's attorney — did not reveal a secret, deeply-held bias against lawyers. Rather, it was an emotional response by Conrad to persistent questioning that Conrad felt (wrongly) was unwarranted. Even the Defendants acknowledge that Conrad was "combative" and "sarcastic" during cross-examination. (Def. Post-Hearing Br. 12). Her response that "most attorneys" are "crooks" is a perfect example of both Conrad's combativeness and sarcasm, but it was not a statement that can fairly be attributed to Conrad's purported partiality while serving as a juror in this case. It was clear from Conrad's words and conduct at the February 15, 2012 hearing that Conrad believed that her verdict was fair because it was based on the evidence and the law, not bias.[3] Although unwarranted and improper, Conrad took umbrage at the prospect of having her objectiveness questioned by

---

[3] Such a conclusion is supported additionally by the note Conrad wrote regarding "vicarious liability" and "respondeat superior" — a note that prompted no defense action at the time. (See Court Ex. 3; Trial Tr. 8832). If Conrad were biased and thus intent on casting her vote for impermissible reasons, why would she have felt compelled to inquire of the Court whether those (civil) legal instructions would be part of the Court's jury charge? Put differently, if Conrad had prejudged the case, there would have been absolutely no reason to send that note, as the legal instructions would have been irrelevant to her decision. Her question demonstrates that Conrad was intent on following the Court's instructions and thus properly judging the case, as everyone perceived her to be doing.

5

defense counsel. (Tr. 142 "[T]he fact of the matter is that you're here to discredit the fact that myself and eleven other jurors convicted your client across the board."). In essence, Conrad thought that the motion for a new trial was meritless and that it would be unjust to undo the jury's work. Conrad carried that sentiment into the Hearing.

    Conrad was also obviously resistant and hostile to the idea of being examined by defense counsel. Conrad appears to have taken her examination very personally and her responses manifested it. The statement at issue here was in response to defense counsel's characterization of Conrad's husband as a "career criminal." Conrad was also irked by earlier questions about the success of her legal practice and her financial success as a lawyer. (Tr. 136-37). And as the Defendants themselves point out, Conrad personalized her examination by noting that, unlike defense counsel, she did not attend an elite law school. (Def. Post-Hearing Br. 10). Although Conrad's contempt towards the questioner was unjustified, it cannot be ignored as a factor in assessing whether her answer was an angry retort or the revelation of Conrad's personal beliefs while serving on the jury. Nor can it be ignored that in Conrad's mind, she voted in the jury room according to the evidence presented over a multi-month period, and in her judgment, the evidence introduced at trial demonstrated that the convicted defendants (two of them practicing lawyers, another a non-practicing lawyer) were "crooks." Even assuming <u>arguendo</u> that Conrad believes that most lawyers are crooks, the Defendants have failed to show that Conrad's alleged belief that most lawyers are crooks was a belief she held during jury service, as opposed to a belief she formed after hearing the evidence at trial.

    It is also passing strange that the Defendants would rely on Conrad's statement that most lawyers are crooks while clinging to the tenuous notion that Conrad showed favoritism to the

6

prosecutors. After all, as the Defendants argue, Conrad herself has had several negative experiences with prosecutors from her arrests and convictions. If Conrad truly bore an animus towards lawyers, it surely would reach the prosecutors given Conrad's personal history, but the Defendants have not even attempted to explain that inconvenient inconsistency. Defendants' attempt now to portray Conrad as someone biased against lawyers is also inconsistent with her acquittal of Craig Brubaker. Brubaker was a non-practicing lawyer, and under the Defendants' construct, Conrad would have prejudged him as a crook. But Conrad voted to acquit Brubaker and Conrad's letter to the Government strongly intimates that she had no problem acquitting Brubaker. (See PMD 7 (Conrad letter to Government explaining acquittal of Brubaker as attributable to his status as "low hanging fruit" (sic)). Finally, and perhaps most glaringly, the Defendants have never offered any explanation for how someone they claim was biased could have voted in the jury room the way Conrad did, a vote with which the other eleven jurors unanimously agreed.

In sum, the Defendants' attempts to find bias in the testimony of Conrad are wholly unpersuasive. In fact, the Defendants' theory of bias is inconsistent with the facts and unsupported by the testimony and the objective evidence.

    **B.**     **Truthful Answers During Voir Dire Would Not Have Mandated Conrad's Removal.**

The Defendants improperly suggest that Conrad would have been dismissed had she answered the voir dire questions honestly, suggesting that the Court would have done so consistent with the Court's practice or out of an abundance of caution. (Def. Post-Hearing Br. 1). This argument ignores the governing legal standard, which requires the Court to determine that dismissal for cause would have been mandated by truthful answers to the voir dire questions — that is, that the Court would have been required to dismiss Conrad for cause due to her partiality. To sustain a

challenge for cause, the challenging party must of course demonstrate that the prospective juror cannot be impartial.  See Swain v. Alabama, 380 U.S. 202, 220 (1965) (showing of partiality is required); United States v. Annigoni, 96 F.3d 1132, 1138 (9th Cir.1996) (challenges to potential jurors must be based upon partiality, such as personal relationship with party, witness or attorney in litigation, or biased state of mind concerning party or issue in case); Dennis v. Mitchell, 68 F. Supp. 2d 863 (N.D. Ohio 1999) (challenge for cause is designed to remove juror who is partial to one side or who has formed opinion prior to hearing evidence); United States v. Pickard, Nos. 00-40104-01 & 02 RDR, 2004 WL 3186232, at *3 (D. Kan. 2004) (defendant alleged jury foreperson lied about his status as an attorney who had gone to law school with the prosecutor; "Federal courts have required a showing of partiality by a prospective juror before a challenge for cause will be sustained.") (citing same).  The fact that a prospective juror may have peccadilloes, eccentricities, a misdemeanor criminal record, or prior substance abuse issues would not require removal as a matter of law, absent a separate demonstration of bias.[4]

      Tellingly, the Defendants cite to no case holding that multiple misdemeanor convictions or one's status as a suspended attorney would have required categorical dismissal for cause.  The Defendants also ignore the Second Circuit's decisions following United States v. Columbo, 869 F.2d 149 (2d Cir. 1989), which unequivocally hold that false statements during voir dire are insufficient, standing alone, to establish juror bias.  See United States v. Stewart, 433 F.3d 273, 305 (2d Cir. 2006) ("The significant factor [was that] none of the correct answers [by the juror] would have

---

[4]  Allowing the reversal of jury verdict based on an "abundance of caution" standard, especially because a juror is unlikable or just plain weird, would open the door to a flood of post-verdict investigations of jurors in the hopes of finding unflattering facts about a juror.  This is precisely the type of challenge courts have taken pains to avoid, in order to preserve the integrity of a jury-based criminal justice system.

supported an inference that he was biased or prejudiced against [the defendants] or had prejudged the evidence."); United States v. Greer, 285 F.3d 158, 173 (2002) (holding that Colombo "did not establish a per se rule requiring a new trial whenever an intentionally false answer is discovered . . . . [A]n analysis of bias is required even if the juror's erroneous response was deliberate."); United States v. Langford, 990 F.3d 65, 68-69 (2d Cir. 1993) (juror's deliberate dishonesty does not warrant a new trial unless it bears on her impartiality). Thus, to the extent the Defendants rely on cases from outside the Second Circuit in arguing that false statements, standing alone, are sufficient to prove bias, that reliance is misplaced.

### C. The Defendants' Challenge to Conrad's Psychological Competence is Frivolous

The Defendants cite to no cases supporting their contention that Conrad should be deemed unfit to serve as a juror because she was mentally unfit. This failure is not surprising, as courts have have refused to set aside a verdict, or even to allow further inquiry, unless there is proof of an adjudication of insanity or mental incompetence closely in advance of the time of jury service, or other virtually unassailable demonstration of contemporaneous mental illness. See United States v. Dioguardi, 492 F.2d 70, 80 (2d Cir. 1974) (noting that courts have required adjudication of incompetency immediately before or after service as juror before mental competency can serve as basis for a hearing or challenging juror's service). The record in this case does not come close to establishing that Conrad was mentally unfit. See id. at 80-82 (no "incompetence" inquiry required where juror sent unsolicited post-trial letter to defense attorney with zodiac sign on letter and in which juror claimed to have clairvoyant powers to determine during trial that the defendant was a good person; court's observations of juror's conduct revealed no incapacity during juror service); Anderson v. Miller, 346 F.3d 315 (2d Cir. 2003) (collecting cases upholding denial of new trial

9

based on juror competency and other issues). This is especially true where the Defendants have not even attempted to explain how any statements made by Conrad, at court appearances months post-trial, reflect anything about her mental state during the trial. Nor have the Defendants shown that the other jurors or anyone else involved in the trial expressed any contemporaneous concern about Conrad's mental competence during trial. Defendants' post hoc speculation about Conrad's mental fitness is insufficient to justify overturning a valid verdict.

## II.     PARSE HAS WAIVED ANY RIGHT TO CHALLENGE THE JURY VERDICT BASED ON CONRAD'S MISCONDUCT

The omissions in Parse's post-hearing brief — on both the law and the facts — speak volumes.[5] First, on the law, Parse remarkably ignores the body of legal authority holding that waiver may be found where the defendant possesses information during trial pointing to possible juror misconduct and fails to exercise reasonable due diligence in acting upon that information.[6] Because this due diligence prong of waiver law resoundingly supports a finding a waiver here, Parse simply omits mention or discussion of it. Instead he argues — in absolutist terms, and unsupported by legal authority — that to find waiver this Court "would have to" conclude that the Brune lawyers positively knew during trial that Juror No. 1 was the suspended lawyer, and furthermore that the

---

   [5]   See April 6, 2012 Letter Brief from P. Shechtman to the Court ("Parse Post-Hearing Waiver Br.").

   [6]   In his October 26, 2011 reply to the Government's initial Waiver Brief, Parse relied on the case of United States v. Owen, 500 F.3d 83, 90 (2d Cir. 2007), arguing that a diligence requirement applies only in cases involving newly-discovered evidence and not in juror misconduct cases. Parse Reply to Gov't Waiver Br. 5. However, the Owen decision deals with a different aspect of Rule 33: the Owen court held that statements about which a defense counsel is aware prior to trial is not "newly-discovered evidence" for purposes of a Rule 33 motion for new trial merely because the evidence becomes "available" to the defendants after trial. Parse willfully fails to acknowledge that many courts, including the Supreme Court in McDonough have imposed a reasonable diligence requirement in cases of juror's lies.

Brune & Richard lawyers and Kramer Levin lawyers all lied under oath at the evidentiary hearing. (Parse Post-Hearing Waiver Br. 9-10).  Parse is wrong.[7]

While a finding of waiver is warranted on both the knowledge and due diligence prongs, as the Government has shown in its prior briefs, this Court can certainly find waiver without reaching questions of actual knowledge or witness credibility.[8]  That is because the record is unequivocal that, at the very least, Parse's experienced defense team failed to exercise reasonable diligence.  During voir dire and again during jury deliberations, they failed to make basic inquiries and the most basic notifications to the Court that the circumstances reasonably required; and their repeated failures to act were deliberate and intentional, and done notwithstanding their awareness at all times that the information in their possession about Catherine M. Conrad could be enormously significant to the Court.[9]

Parse acknowledges, as he must, the ineluctable impact of Brune & Richard's complete lack

---

[7] Parse's suggestion that there cannot be a valid waiver unless the defendant personally agreed to forego a challenge to Conrad is also wrong.  A defendant's rights, even those of constitutional dimensions, may validly be waived through the actions of counsel, so long as the category of rights at issue concern "strategic and tactical matters."  United States v. Plitman, 194 F.3d 59, 63 (2d Cir. 1999) (counsel permitted to waive defendant's Sixth Amendment confrontation rights).  The decision regarding which jurors should sit on the jury is, of course, a quintessential "strategy" decision.  See United States v . Lawes, 292 F.3d 123, 128 (2d Cir. 2002) ("trial strategy and voir dire are inseparable").

[8] Likewise, contrary to Parse' suggestions (Parse Post-Hearing Waiver Br. 9, 13), this Court need not make a finding that the Brune & Richard attorneys acted in bad faith or breached their ethical obligations to find that their actions constituted a waiver, because the legal standard on waiver encompasses not just actual knowledge of juror misconduct, but a lack of reasonable diligence in determining whether or not a juror engaged in misconduct during voir dire.

[9] Parse concedes that the Brune & Richard attorneys could have but did not take a number of basic steps to learn the truth about Catherine Conrad prior to the verdict.  (Parse Post-Hearing Waiver Br. 11-12.  See also Gov't Post-Hearing Br. 42-44 (listing steps Brune & Richard could have but did not take)).

of diligence: "We understand the Court's frustration at having a lengthy trial jeopardized by juror misconduct <u>when the issue might have been averted had the Brune lawyers told the Court that there was a suspended lawyer with the same name as juror #1</u>. (Parse Post-Hearing Waiver Br. 13) (emphasis added). As this concession shows, Brune & Richard "had the tools" to uncover the full extent of the misconduct, but deliberately chose not to use them.

Second, Parse's omissions on the facts are also telling. While Parse's brief begins by stating that the facts "should not be in serious dispute," the brief then proceeds to omit mention of the most disturbing and key facts about the Parse team's conduct. For example, Parse's factual recitation fails to mention that the Brune & Richard partners internally considered and rejected, during trial, the option of informing the Court of their discoveries of a suspended lawyer with the same name as Juror No. 1. Parse's brief fails to mention that, on May 12th during the plaza conversation, Theresa Trzaskoma affirmatively recommended to Brune and Edelstein that more investigation of Juror No. 1 be pursued (before being told by Brune to shut it down).

Another critical fact that Parse ignores entirely is Trzaskoma's possession and review of the Westlaw report, which — by itself — triggered a duty of reasonable diligence and notification by Trzaskoma with which she utterly failed to comply. The Westlaw report, which was run by a paralegal at her direction, drew multiple factual links between Catherine M. Conrad the Juror No. 1, and Catherine M. Conrad the suspended lawyer. Yet, Trzaskoma did absolutely nothing with it. By her own testimony, she did not tell her partners Brune and Edelstein about it; she did not share the report with the Kramer Levin lawyers;[10] she did not disclose the report to the Government, the

---

[10] This fact discounts any value of the argument about the testimony of the Kramer Levin attorneys Paul Schoeman and Barry Berke. What is clear from their testimony is that Trzaskoma and Brune did not, in their brief casual conversations with Schoeman and Berke, provide either of them with any of the powerful underlying facts in Brune & Richard's possession by May 12th, and it is

12

Court, or the other defense counsel; and she did not pursue follow-up inquiries or investigation, even though she herself believed such investigation to be necessary.

Trzaskoma's attempts at the Hearing to dismiss the significance of the Westlaw report are self-contradictory and unpersuasive, and serve only to further highlight the lack of reasonable diligence by Brune & Richard. Trzaskoma claimed that she was confused by the Westlaw report because she is not an expert in reading such reports and thought it might be conflating two people. If that truly were the case, then any reasonably diligent attorney in Trzaskoma's shoes — who had an investigative agency, a team of paralegals, and an unlimited budget at her disposal — would have had more research done. Put simply, if Trzaskoma was concerned that the Westlaw report could be reporting information on two people, then, given the potential significance of the information, the only reasonable approach was to follow up and find out more (which is the approach she initially took) and notify the Court. The notion that Trzaskoma would stop that diligence cold in its tracks, without even telling Brune and Edelstein about the Westlaw report, is inexcusable and defies common sense. Trzaskoma was an experienced partner in charge of the inquiry into Conrad. A finding of waiver here cannot and should not be excused just because Trzaskoma did not share with her partners the existence and contents of the Westlaw report.

In an effort to dismiss the significance of the Westlaw report, Trzaskoma further claimed at the Hearing that she was so persuaded by Conrad's voir dire responses that Conrad was a different person that she thought "it was a very remote possibility that our juror was the suspended attorney." (Tr. 59). However, that testimony contradicts Trzaskoma's own acknowledgement on May 12th that Conrad might have lied during voir dire, in light of information that Trzaskoma herself wanted to

---

equally clear that Schoeman and Berke, unlike Brune & Richard, certainly did not undertake any investigation of their own about Conrad.

investigate further. It also contradicts the entire documentary record showing that Trzaskoma reacted strongly to the information in the Westlaw report, causing her to express the belief that Juror No. 1 and the suspended attorney were the same person. Parse's brief makes no attempt whatsoever to grapple in a real way with any of these inconsistencies.

Rather, Parse contends that the Government is merely engaging in "hindsight bias" on the waiver issue, because "now that we know that juror #1 is the suspended lawyer, we forget just how unimaginable that notion was last May." (Parse Post-Hearing Waiver Br. 11). This argument is risible. As the email traffic proves, Conrad's status as a suspended attorney was anything but "unimaginable" to the Brune & Richard attorneys and paralegals on May 12, 2011. Indeed, on May 12, all four of the Brune & Richard personnel most immersed in the details of jury selection recognized that Conrad was, or at the very least might have been, a suspended attorney with an alcohol problem, prior to the return of the jury's verdict. Given these facts, if anything is unimaginable it is that the Brune & Richard attorneys affirmatively decided not to bring their findings to the Court's attention to allow the Court to act.

Furthermore, Parse's suggestion that the misleading post-trial actions of the Brune & Richard attorneys "should not matter," (Parse Post-Hearing Waiver Br. 12-13), flies in the face of reality and common sense. Those actions, of course, are highly relevant in illuminating the Brune & Richard attorneys' true knowledge and intent about the issue. Their deliberate and calculated decision not to tell the full, complete, and accurate state of their knowledge about Catherine Conrad in the factual discussion in their initial brief, and to mislead the Court further during the July 15, 2011 conference call, strongly suggests that the Brune & Richard attorneys were, at a minimum, uncomfortable with the truths exposed by the evidence of their knowledge and conduct prior to the return of the jury's

14

verdict. In any event, the Brune & Richard attorneys' post hoc attempts to minimize this knowledge and conduct cannot overcome the documentary and testimonial evidence about their findings pre-voir dire and on May 12th.[11]

Moreover, even if this Court were to credit the testimony of the Brune & Richard lawyers that they did not contemplate a new trial motion until after July 20th, such a view does not mean that Parse should prevail on the waiver issue. Whatever the Parse team's views of a prospective new trial motion prior to their receipt of Conrad's letter, no court has engrafted onto the "reasonable diligence" requirement a separate requirement that a defense attorney must affirmatively contemplate that the undisclosed facts could form the basis of a motion for new trial motion. Any contrary finding would place the decision about what to do about potential juror misconduct in the hands of defense attorneys who may or may not want, for strategic reasons, to bring evidence of juror

---

[11] The attempt in the Gillers declaration to defend the accuracy of the representations in the Brune & Richard initial brief is unpersuasive. Gillers contends, for instance, that the representations concerning the Conrad letter — viz., the Conrad letter "prompted the [Defendants] to investigate" — were both literally and contextually true because the letter did, in fact, cause the defendants to investigate. Gillers Decl. ¶¶ 23-24. It did not. The letter caused the defendants to investigate further — and any faithful and accurate rendition of facts would have disclosed that a previous and significant investigation had already been undertaken. Further, Gillers asserts that the Brune & Richard representation that they had "no basis" to inquire of Conrad further during voir dire was "true as reasonably read" because the attorneys had concluded during voir dire that Conrad was not the suspended New York attorney in the Appellate Division suspension order. Id. at 24. But this conclusion is flawed because it mistakes "no basis" with "no valid basis." The Brune & Richard attorneys did, of course, have a basis, because the Appellate Division suspension order in the hands of Theresa Trzaskoma had led her to at least form a belief that it was the same person — as evidenced by the Brune & Richard contemporaneous email. See GX 14, p. 81 (Randall Kim email ("We (I thought TT [Theresa Trzaskoma]) found something more, which more clearly suggested she has been/is and [sic] alcoholic.")). Perhaps what Gillers was describing when discussing the Brune & Richard representations was what he previously had described as a "legally accurate lie" — that is, a lie that, although not susceptible to forming the basis of a perjury charge, is properly and reasonably viewed as part of an attempt to deceive. Stephen Gillers, *'Accurate Lies' — The Legal World of Oxymorons*, Los Angeles Times, Aug. 30, 2008. Finally, we note that both Gillers and the Brune & Richard attorneys curiously omit any mention of the fact that his declaration is being offered as the opinion of a paid expert rather than that of a disinterested academician.

misconduct to a court's attention.[12]

Accordingly, this Court should find that a waiver occurred here, based on the plain record that demonstrates what information the Parse team possessed, discussed, knew, and believed ("Jesus, I do think that it's her") during trial, and what they deliberately decided not do during trial with that substantial information.

## CONCLUSION

For these reasons, and for the reasons set forth in the Government's initial, supplemental, and post-hearing memoranda of law, Defendants' motion for a new trial should be denied.

Dated: April 19, 2012
      New York, New York

                               Respectfully submitted,

                               PREET BHARARA
                               United States Attorney
                               Southern District of New York

                By:    s/Nanette L. Davis
                         Stanley J. Okula, Jr.
                         Nanette L. Davis
                         Jason P. Hernandez
                         Assistant United States Attorneys
                         (212) 637-1585
                         stan.okula@usdoj.gov
                         (212) 637-1117
                         nanette.l.davis@usdoj.gov
                         (212) 637-1024
                         jason.hernandez2@usdoj.gov

---

[12] It is useful to note that the parties had agreed on June 24, 2011 that the Defendants' post-trial motions were not due to be filed until July 20, 2011. Thus, it is hardly surprising that the Parse lawyers, some of whom vacationed in the immediate wake of the trial, had not discussed before they received the Conrad letter their knowledge of the Conrad lies as a basis for a new trial.

## **CERTIFICATE OF SERVICE**

      I hereby certify that this document, filed through ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that paper copies will be sent to those indicated as non-registered participants on the above date.

> By:    /s/ Nanette L. Davis
> Stanley J. Okula, Jr.
> Nanette L. Davis
> Jason P. Hernandez
> Assistant United States Attorneys
> (212) 637-1585
> stan.okula@usdoj.gov
> (212) 637-1117
> nanette.l.davis@usdoj.gov
> (212) 637-1024
> jason.hernandez2@usdoj.gov