**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | S3 09 Cr. 581 (WHP) |
| PAUL M. DAUGERDAS, | ) | |
| DONNA GUERIN, | ) | |
| DENIS FIELD, and | ) | |
| DAVID PARSE, | ) | |
| | ) | |
| Defendants. | | |

**DEFENDANT DONNA GUERIN'S AMENDED SENTENCING MEMORANDUM**

Donna Guerin respectfully submits this sentencing memorandum and the attached letters in advance of her sentencing hearing scheduled for March 1, 2013.  For the reasons discussed in this memorandum, and in view of the information provided to this Court through the attached letters and the Presentence Investigation Report, Donna respectfully submits that a critical analysis of the mandatory provisions of 18 U.S.C. § 3553(a) dictates a sentence substantially below the applicable advisory guideline range.

**I.     Introduction**

The goal of the sentencing process is to fashion a sentence that is "sufficient, but not greater than necessary, to comply with" the purposes set forth in 18 U.S.C. § 3553(a)(2): (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (B) to afford adequate deterrence; (C) to protect the public from further crimes of the defendant; and (D) to provide any needed training, treatment or medical care.  18 U.S.C. § 3553(a).

To determine the sentence that is sufficient, but not greater than necessary, sentencing courts after *Booker* must make their "own determination of an appropriate punishment after

considering the general sentencing factors in § 3553(a) . . . ." *United States v. Carter*, 696 F.3d 229, 230 (2d Cir. 2012).   Those factors include:   (1) the history and characteristics of the defendant; (2) the nature and circumstances of the offense; (3) the need to avoid unwarranted sentence disparities among similarly-situated defendants; (4) the need to provide just punishment and adequate deterrence; and (5) available sentences.

The sentencing guidelines are not presumed to be reasonable.   *Nelson v. United States*, 555 U.S. 350, 352 (2009).   They are simply "one factor among several" to be considered in imposing an appropriate sentence.   *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). Sentencing courts are "generally free to impose sentences outside the recommended range." *United States v. Cavera,* 550 F. 3d 180, 189 (2d Cir. 2008) (en banc) (making it "emphatically clear that the Guidelines are guidelines – that is, they are truly advisory").

Considering the nature and circumstances of Donna's conviction, the punishments she has already suffered, the sentences received by similarly-situated defendants, the otherwise exemplary life led by Donna, the valuable role she plays within her family, and the lack of any possibility of recidivism, the sentence that is minimally sufficient to satisfy the purposes of sentencing is one well-below the sentences imposed upon defendants in this district who were convicted of similar offenses.[1]

## II.      The Sentencing Factors Set Forth in § 3553(a) Call for a Below-Guideline Sentence

### A.      Donna Guerin's Personal History and Characteristics

In evaluating Donna's history and characteristics, the Court must consider her entire character.   Donna's character is reflected in the letters attached to this memorandum as Exhibit 1, letters that were written on Donna's behalf by those who know her best.   The letters come from

---

[1] Guerin does not object to the PSR's calculation of the stipulated guideline range.   She has submitted her corrections and objections to the PSR to the Probation Officer.

Donna's mother, her husband, her minister, her relatives, her social friends, and her professional colleagues. While the letters reveal many facets of Donna's life that will not be repeated here, certain aspects of her character and history merit a particular focus.

Donna is an only child who grew up in Chicago. Her parents divorced when she was very young, and she lived with her mother and grandmother. Donna's mother supported the family by working first as a book-keeper and ultimately as a contract acceptance and compliance coordinator. Donna's grandmother was her "primary daycare." Donna's grandmother, who was born in Czechoslovakia, taught Donna to speak Slovak, "while Donna (even as a young child) tried to help her with English grammar." Donna learned from her grandmother, and took over many of the family's chores as her grandmother's health failed. When Donna was eight, her father remarried and moved to Florida. Thereafter, Donna only saw her father during school vacations. But Donna continued to visit her father as a young adult, which her mother describes as a testament to "her strong sense of family." Her father has since passed away.

Donna always has been a productive member of society, has never before been in trouble with the law, and has no history of violent or aggressive behavior. Donna does not abuse drugs or alcohol. She has complied with all orders and directives of the Court while awaiting judgment and she consistently has shown respect for the Court, the government, and the integrity of the process used to resolve this case. The fair measure of Donna Guerin, however, is not found in a litany of things that she has not done, or in recounting the mistakes she has not made. Instead, it is found in the response she elicits from the people whose lives she has touched. The letters supplied to the Court describe a selfless and humble person.

Donna lived with her mother until after she finished law school. It is clear from Donna's mother's letter that the two share a special relationship and that her mother is very proud of her.

3

Her mother explains that although Donna is her daughter, "she is also [her] best friend." Donna's mother describes Donna as "smart, caring, considerate and non-judgmental to people from all walks of life and social status." Donna's mother laments that she will soon need Donna's help, but that "she won't be there for me" if she is incarcerated. Donna's mother, who is 83 years old, depends on Donna and her husband for many things, and she worries about what the future will bring for her as she ages without Donna's support. Donna's husband states in his letter that he "know[s] how important it is to Donna to be there for her mother, since [her mother] worked so hard to provide for Donna while she was growing up."

Donna is also a devoted and faithful wife who provides strength and companionship for her husband in all circumstances. Donna married Thomas Guerin in 1997. In his letter to the Court, Mr. Guerin describes his wife as "one of the kindest, most generous, smartest, hard-working and most honest persons you'll ever meet." Mr. Guerin explains that during the ten years before he and Donna were married – "the most difficult time of [his] life" – Donna "stood by [him] and helped [him] with respect to [his] health, as well as emotionally and financially." Despite his fears that his health would make it hard for him to be "a good husband," he and Donna married because they both dreamed of starting a family. Mr. Guerin's devotion to his wife was evident in his attendance at court proceedings in this case, and his determination to stand by Donna is evident in his letter.

Mr. Guerin's letter (and letters from others) outlines the significant heartache, stress, and cost involved in Donna and her husband's attempts to have a child. In early 2000, Donna discovered that it was not medically possible for her to become pregnant. She began the *in vitro* fertilization process and began spending less time at the office. After several unsuccessful attempts and many surgeries, Donna and her husband began to explore the possibility of

adopting a child.  They stopped this process once it was clear that Donna was going to be indicted on criminal charges.  The most painful consequence of Donna's mistakes is the loss of the opportunity to fulfill her lifelong dream of being a mother and starting a family.  Mr. Guerin describes this pain in his letter:

> I have seen Donna interact with children, and I know she would have been an exceptional parent; she is attentive and nurturing and loving.  I saw the pain and ordeal she went through trying to have a child, so I know how very much it meant to her to be a mother.

By her actions Donna has forfeited the opportunity that mattered more to her than any partnership or compensation award.

　　As the Court reads the heartfelt words of the many who wrote in support of Donna, it will learn of instances of sacrifice by Donna, of the times when Donna put the needs of others ahead of her own.  To those who know her best, it is obvious that Donna's actions are prompted by caring and by love.  Even against the backdrop of this case, the truth is that Donna is not greedy and she is not ambitious for power or prominence.  Donna has admitted to making significant mistakes, to committing crimes.  This Court is uniquely equipped by experience to appreciate, however, that some crimes are committed by people who lead otherwise exemplary lives.  Sometimes good people make bad decisions.

　　Donna recognizes that her conduct was criminal and she understands that criminal conduct brings about losses and penalties that are painful but appropriate.  Nevertheless, it is important for this Court to appreciate that Donna's life is much more than a story of tax shelters for the super-rich.  Donna Guerin's life is a story of family, of love, of an unselfish desire to be of service to others, and of a deeply emotional ambition to be in a family of her own.  The letters provided to this Court tell that story, each in their own way, and Donna is deeply appreciative of this Court for taking the time to consider those letters.

**B.      Nature and Circumstances of the Offense**

On September 13, 2012, Donna Guerin pleaded guilty to conspiring to defraud the United States by obstructing the Internal Revenue Service and engaging in wire fraud, in violation of 18 U.S.C. § 371, and to tax evasion, in violation of 26 U.S.C. § 7201.  Donna recognizes that the crimes to which she pleaded guilty are serious offenses, and she accepts full responsibility for her actions.  The reasons why a woman of such otherwise impeccable character would engage in this behavior is best understood in the context of the tax shelter boom and Donna's employment history.  Although Donna undoubtedly played a role in a scheme that involved a very large amount of intended loss, her role and culpability are relatively minor when compared to that of others with whom she worked.

Donna's criminal case is just one of a series of similar cases involving nationally-prominent law firms, giant accounting and consulting firms, huge international financial institutions, and many of the most financially-successful people in America.  These cases are the culmination of a phenomenon that began during the mid-1990s and continued into the new millennium.  The phenomenon involved tax shelters, specifically the development of new theories by which income might be insulated from federal taxation.  Tax shelters have been around since the Internal Revenue Code was passed, but they were perhaps more popular and more widely used during the late 1990s than at any previous time in history.  The economy was booming, new millionaires were being created daily, and the major law and accounting firms were catering to their high-net-worth clientele.  Tax professionals took note of uncertain and sometimes contradictory rulings in tax cases, and they decided that unsettled principles of tax law could provide opportunities to develop aggressive legal strategies.  Not surprisingly, those tax professionals learned that their ultra-wealthy clients were highly receptive to the notion that

6

they could sharply minimize the amount they paid in tax.  Apparent opportunity met with big money, and a fierce competition quickly ensued to develop new kinds of tax shelters.

This competition was national in scope and it cut across industry lines.  Financial advisors at boutique investment firms competed with partners at huge accounting firms to develop new types of tax shelters.  Highly accomplished economists and tax experts raced to define and market new and different tax shelter strategies.  Soon the most prominent public accounting firms in the country were players in the game.  The tax departments at KPMG, Ernst & Young, BDO Seidman, PricewaterhouseCoopers, and Arthur Andersen (then a well-regarded public accounting giant) devised tax shelter strategies, and their partners in the high-net-worth departments spread the news among their firms' wealthiest clients.  Each major accounting firm tried to create its own identity within the tax shelter marketplace, usually by rolling out a distinctive product name for each shelter, and the competition to enlist wealthy clients in tax shelter deals quickly spread to every corner of the country.

In many instances these tax shelter strategies relied on deductions or losses related to investment and trading activity, so the major accounting firms that developed the shelter strategies began to form business alliances with major banks and trading houses.  Brokers, traders, and investment advisors to the rich saw opportunity, and they eagerly entered the tax shelter marketplace.  The financial institutions that conducted the required transactions did so only after their own compliance experts and tax advisors reviewed the underlying tax strategy.  Like most of the in-house lawyers and tax experts at the major accounting firms, the tax professionals and lawyers at the banks and trading houses also approved the activities of their personnel in supporting the burgeoning tax shelter business.  The accounting firms and financial

advisors then brought their wealthy clients to the traders and brokers to conduct the financial transactions required by the tax shelter, and the tax shelter marketplace continued to grow in size.

The tax professionals at the major accounting firms who devised these shelters often were lawyers as well as tax accountants, but they could not provide legal opinions in support of the tax shelter strategies.  Lawyers were available, however, to fill that role.  Sometimes, as was true of Donna's co-defendant Paul Daugerdas, lawyers at major law firms refined tax shelter strategies of their own.  Other times, as was true of Donna and her co-defendant Erwin Mayer, the tax shelter strategy was the work product of someone else.  In either case, lawyers were asked to issue opinion letters in support of the tax positions adopted by clients using the tax shelters and, once again, the very best law firms across the United States agreed to enter the tax shelter marketplace.  Prestigious firms such as White & Case; Proskauer Rose; Milbank, Tweed, Hadley & McCoy; Arnold & Porter; LeBoeuf Lamb; Hunton & Williams; and Locke Liddell entered the competition.  Big and small law firms from California to Texas to Florida issued opinion letters to support various tax shelter strategies.

Although Donna also participated in this competitive marketplace, her route to this courtroom is unlike that taken by others who have faced punishment for their work on tax shelters.  Always interested in taxation during law school, Donna's first job as an attorney was with a small law firm in Chicago, where she was an associate working on straightforward tax matters for the firm's clients.  Throughout her entire legal career, she had no "book" of her own business; she was a service attorney.  After enduring sexual harassment at her initial firm, Donna moved to another small tax firm where she worked on routine tax matters such as estate planning or employment benefits programs.  When Donna received an offer to join the Chicago firm Altheimer & Gray, she quickly accepted.  Her employment with Altheimer began in a promising

but uncomplicated way: she was an associate attorney in the tax department of a well-regarded but local firm, doing what could be characterized as garden variety federal tax work.

Donna's situation – and indeed, her life – changed significantly when Paul Daugerdas joined Altheimer & Gray in 1994.  Mr. Daugerdas came to Altheimer after a successful tenure with Arthur Andersen in Chicago and he brought with him an aggressive approach to tax planning that many leading partners at Altheimer found enticing.  This aggressive approach involved several income tax shelter strategies, including one known as the "Short Sale" strategy that Mr. Daugerdas first used while at Andersen.  It strongly resembled, and was in competition with, strategies then being marketed by Ernst & Young, KPMG, and others.  Very soon after Mr. Daugerdas joined the Tax Department at Altheimer, the firm encouraged Donna to assist him as he developed the firm's tax shelter business, although Donna also continued to work on more traditional tax matters.

The tax shelter marketplace was then at its peak, and the fees paid by Mr. Daugerdas' clients greatly improved the profitability of Altheimer's tax practice.  Erwin Mayer, another Altheimer attorney, joined Mr. Daugerdas and Donna in the tax shelter practice and a pattern was formed that would maintain throughout the time period relevant to this case.  Mr. Mayer developed his own relationships, first with insurance agents, accountants, or financial advisors and then with their wealthy clients.  He used the same tax shelter strategies as Mr. Daugerdas, but he grew his own client base.  Mr. Daugerdas relied on his own, separate group of contacts to build his own client list and he relied on Donna to support him by ensuring that the required paperwork was done to accomplish the tax shelter strategy.   Unlike Mr. Mayer and Mr. Daugerdas, Donna was neither a rain-maker nor a generator of new business.

The PSR describes Donna Guerin "as the *junior partner* in implementing the shelters," PSR, ¶ 55, page 22 (emphasis supplied).  That accurately portrays the role that Donna played in the tax shelter business conducted at Altheimer, and later at Jenkens & Gilchrist ("J&G").  Mr. Daugerdas chose and refined the tax shelters sold to Altheimer and J&G clients, just like he fostered relationships with accountants whose wealthy clients wanted access to those shelters. Donna entered the scene after those relationships were formed, gathering data and documenting the steps required to engage in the shelter.  Indeed, even though many clients of J&G and Altheimer testified at the trial, no witness said that he first heard of the tax shelter from Donna, or that Donna was the first person to approach him with the idea of participating in a shelter.  In all instances, others from J&G or from firms like BDO introduced the wealthy client to Donna so that she could implement the steps needed to complete the tax shelter strategy.

In 1998, when Mr. Daugerdas was recruited to join Jenkens & Gilchrist, an attorney named Michael Cook was Chairman of the J&G Tax Department.  Arguably the leading tax practitioner in the State of Texas, Mr. Cook formerly served as Chair of the Texas State Bar Association section on taxes.  Mr. Cook and the other incumbent shareholders at J&G made clear to Donna that J&G coveted Mr. Daugerdas and his tax shelter business, but that if she wanted to come with Mr. Daugerdas to the firm's new Chicago office, she would be permitted to do so. Because of the stark difference in their roles, J&G treated Mr. Daugerdas much differently than it treated Donna.  Mr. Daugerdas was allowed to form a unique arrangement with the firm that compensated him under a formula based on the fees paid to J&G by his clients; Donna was paid by J&G like all other shareholders in the firm.  J&G offered Mr. Daugerdas the position of Managing Shareholder of its Chicago office; Donna was obliged to go to Dallas and interview with the firm's Hiring Committee before an offer was extended to her.  Among her peers and her

fellow shareholders at J&G, it was acknowledged that Donna's role within the firm was to support Mr. Daugerdas' practice, even as J&G itself took extraordinary steps to support that practice.

When Mr. Daugerdas, Mr. Mayer and Donna joined J&G, Michael Cook personally reviewed the Short Option strategy and approved it for use by the firm's Tax Department. Other attorneys in J&G's Austin, Texas office quickly got involved in the tax shelter practice, people such as Patrick O'Daniel, a former clerk to a Supreme Court Justice, and Bryan Lee. These attorneys conducted the research and issued the memoranda within J&G that provided the legal justification for the shelters. Mr. Cook, Mr. Lee, Mr. O'Daniel and other lawyers in J&G's tax department, including Donna, worked each year to revise the language of the opinion letters issued by J&G to support the tax shelters, just as they participated in the approval process that preceded issuance of J&G tax opinion letters in this case.

At J&G, Donna was surrounded by brilliant and accomplished lawyers who worked alongside her every day to implement the tax shelters. She was in almost daily contact with consultants and advisors like Michael Kerekes or Robert Greisman of BDO Seidman, highly educated men armed with advanced degrees in taxation from the very best universities in America, men who joined her in the daily task of assuring that the documentation and trading needed for the tax shelters was accomplished. Donna could look around the tax shelter marketplace and see only successful and intelligent people who were affiliated with the most famous brand names in America's financial and legal professions. It was in this environment that Donna lost her ethical compass and committed the offenses to which she has entered her plea of guilty.

When Donna left Altheimer & Gray to become a partner at J&G, she knew she was expected to support wealthy clients who were participating in very aggressive tax shelters. As Donna stated when entering her plea of guilty, she also knew that these tax shelters would be measured by whether the clients had genuine and substantial non-tax business reasons for engaging in the complicated steps required by the Short Option strategy (and its successors). Donna pled guilty in this case because, as she told this Court, ultimately she could not close her eyes to the fact that many of her clients did not have that necessary mental state. In a very real way, Donna was blinded by the sheer size and weight of the tax shelter marketplace, a bazaar of fabulously wealthy clients asking to avoid paying taxes, and the leading professionals at national firms who were willing to help them do just that.

### C.      The Need to Avoid Unwarranted Sentencing Disparity

Against this backdrop, it is particularly useful to consider the sentences of others prosecuted for their role in tax shelter activities when determining the appropriate sentence in this case. In sentencing a defendant, the Court must take into account "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" 18 U.S.C. § 3553(a)(6). Although the primary goal of this factor is to prevent nationwide disparities in sentencing, it is equally appropriate for the Court to consider the sentences imposed in related cases or even among co-defendants. *United States v. Wills*, 476 F. 3d 103, 109-11 (2d Cir. 2007) (abrogated on other grounds by *United States v. Cavera*, 550 F. 3d 180, 191 (2d Cir. 2008) (en banc)); see also *Gall v. United States*, 552 U.S. 38, 55-56 (2007) (approving of the district court's consideration of both "the need to avoid unwarranted disparities, but also . . . the need to avoid unwarranted similarities among other co-conspirators who were not similarly situated").

That rule is especially apt here.  Beginning in 2005, the government brought several major criminal prosecutions as a result of tax shelter activities that took place between 1990 and 2004.  Those tax shelter activities occurred across the country.  Defendants charged in those cases came from California, Texas, Ohio, Illinois, Florida and all corners of America.  One common thread united those prosecutions: all were pursued in the Southern District of New York by teams drawn from this district's United States Attorney's Office and the Tax Section at the Department of Justice in Washington.  All convictions obtained in these tax shelter cases were obtained in this district and all sentences imposed from the tax shelter prosecutions were handed down in this district.

These other cases involved tax shelter fact patterns that are virtually identical to those found in this case.  Major accounting firms developed aggressive tax shelters and urged their partners to market the shelters to their wealthy clients.  Major financial institutions were brought aboard to implement transactions that would generate the tax losses claimed under the shelter.  Lawyers at prominent law firms issued opinion letters that were supposed to insulate the taxpayer from penalties in the event of an IRS challenge.  These defendants were charged in huge, multi-count indictments that charged a *Klein* conspiracy (18 U.S.C. § 371) as the unifying center of the case, bolstered by dozens of individual Income Tax Evasion (26 U.S.C. § 2701) counts against the defendants.

In short, these other prosecutions are not merely comparable because of the statutes charged or the kind of conduct proven at trial.  These other prosecutions are different facets of a broader course of industry conduct, and collectively they are part of a unitary whole, the government's concerted effort to put an end to the tax shelter marketplace of the 1990s.  For this single reason, the Court should consider the sentences imposed on the following defendants both

as indicators of what a minimally-sufficient sentence is for the conduct at issue, and to avoid creating an unfair disparity in the treatment of Donna and similarly-situated defendants.

The first case, *United States v. Stein, et al.*, No. 05 Cr. 888 (LAK), involved partners and lawyers in the National Tax Department of KPMG and it was the first of the major tax shelter prosecutions to proceed to trial. The primary defendant in that case was John Larson, who was a CPA and an attorney. Mr. Larson once held a position of significant influence within KPMG, serving as Senior Tax Manager in the firm's National Tax Practice. Another KPMG partner, Robert Pfaff, also was a CPA and an attorney. In 1997, these two men determined that the best way for them to profit from KPMG's tax shelter business was to leave KPMG and form their own business, Presidio Advisory Services. Other KPMG advisors then referred their clients to Presidio for implementation of the shelters and Presidio also marketed their services to non-KPMG clients. Raymond J. Ruble, a lawyer at the firm Brown & Wood, assisted in those efforts by issuing opinion letters to KPMG/Presidio client taxpayers.

Defendants Larson, Pfaff, and Ruble stood trial and each was found guilty by a jury on a dozen or more counts. The government commented in its sentencing submission that "Larson and Pfaff (and, to a slightly lesser extent, Ruble) played crucial roles in almost every phase of" the illicit tax shelter practices marketed by KPMG and Presidio. *Stein*, No. 05 Cr. 888 (LAK), Dkt. No. 1442, at 18. Larson was described as "one of the single most important individuals involved in creating the [KPMG] tax shelter scheme" because of his success in forming alliances with banks and in marketing the scheme to taxpayers. *Id.* The government wrote that "Pfaff was a close second in each of these regards[.]" *Id.* According to the government, Mr. Ruble also played a role that "was unquestionably central to the development and success" of the scheme, primarily through "his ability to deliver the prestige associated with his law firm[.]" *Id.* at 21.

At sentencing, Mr. Larson received a sentence of 121 months in prison and a fine of $6,000,000, Mr. Pfaff was given a prison term of 97 months' and a fine of $3,000,000, and Mr. Ruble was sentenced to a prison term of 78 months in prison.[2]

In 2007, similar indictments were returned in this district against lawyers and tax professionals from Ernst & Young in the case *United States v. Coplan, et al.*, No. 07 Cr. 453 (SHS).  In that case, a nationally-prominent public accounting firm eagerly competed in the tax shelter marketplace, marketing shelters to its clients.  Robert Coplan was at the heart of these efforts, serving as National Director of E&Y's Center for Family Wealth Planning.  Mr. Coplan, who had previously served as a Branch Chief for the IRS, is a lawyer with an L.L.M. in federal taxation.  His partner at E&Y, Martin Nissenbaum, was the National Director of E&Y's Personal Income Tax and Retirement Planning section.  Mr. Nissenbaum is also a lawyer with an L.L.M. in federal taxation.  A third indicted E&Y partner who marketed the E&Y tax shelters was Richard Shapiro, also an attorney.  The fourth defendant in the E&Y case, Brian Vaughn, was a CPA and a Certified Financial Planner employed by Ernst & Young.  Mr. Vaughn was subordinate to Mr. Coplan and Mr. Nissenbaum.

Mr. Coplan, Mr. Nissenbaum, Mr. Shapiro, and Mr. Vaughn stood trial and were convicted by a jury.  Mr. Coplan was convicted on five counts.  He was sentenced to a term of 36 months in prison and was fined $75,000.  Mr. Nissenbaum was convicted on four counts and received a sentence of 30 months in prison and a fine of $100,000.  Mr. Shapiro was convicted

---

[2] In the KPMG and E&Y cases, the indictments did not include a forfeiture count against any defendant.

on three counts, and he received a sentence of 28 months in prison and a $100,000 fine.[3]  Mr. Vaughn was sentenced to a term of 20 months in prison.

In 2008, an indictment was brought in this district against a former Bank One executive who marketed the so-called "HOMER" tax strategy discussed in Donna's case.  *United States v. Ohle*, No. 08 Cr. 1109 (JSR).  The executive, John Ohle, is a lawyer and a CPA who was involved in the tax shelter marketplace.  Mr. Ohle was a particularly effective practitioner of the tax shelter arts and he quickly developed so much business that he left Bank One to start his own tax consulting practice.  Mr. Ohle's name came up on occasion during the trial in this case because he developed a relationship with Mr. Daugerdas (but not Donna).  Mr. Ohle was heavily involved in marketing the HOMER tax shelter and he was especially successful in his native state of Louisiana, where he recruited several clients whose returns were at issue in the trial of the case involving J&G.

Mr. Ohle was among the most aggressive participants in the tax shelter marketplace, but he did not restrict his illegal activities to the Internal Revenue Code.  To the contrary, he also devised a scheme to defraud Bank One out of fees and payments gained through the marketing of tax shelters, and he involved a childhood friend who was a Louisiana lawyer in an array of sordid schemes to launder money and conceal his fraudulent conduct.  After standing trial in this district, a jury found Mr. Ohle guilty of all three counts lodged against him.  Mr. Ohle was sentenced to 60 months in prison, concurrent as to all three counts, a restitution obligation of $5.5 million, and forfeiture in the amount of $2.7 million.

Seven of these eight defendants were lawyers when they committed their criminal offenses.  Each of those seven lawyer-defendants played a much more prominent role in his case

---

[3]   The convictions of Mr. Nissenbaum and Mr. Shapiro recently were reversed by the Court of Appeals.

and in his partnership or business than Donna did in hers.  The seven lawyers were national practice group leaders and highly-placed managers of their firms.  In particular, Mr. Larson and Mr. Ruble are comparable to Donna's co-defendant, Mr. Daugerdas, who developed the tax strategies, formed alliances with other professionals, and obtained backing from prestigious law firms by issuing the opinion letters needed to make the shelters marketable.  Under any objective analysis, both were much more culpable than Donna.  Mr. Ohle, an attorney who lied to the IRS, to his employers, and to his clients, and who was far more aggressively involved in marketing tax shelters than Donna, received a sentence of 60 months in prison.  It cannot fairly be maintained that Donna's conduct was on par with Mr. Ohle's.

Donna is most similarly-situated to Mr. Vaughn of E&Y, who was convicted of both a *Klein* conspiracy and an evasion count, and who received a sentence of 20 months in prison.  Mr. Vaughn is a CPA who, like Donna, was a subordinate to the practice group leaders who fostered his firm's participation in the tax shelter marketplace.  Like Donna, Mr. Vaughn worked to implement tax shelters but he did not design them, he did not seek alliances with other professionals to expand their reach, and he did not have the status within his firm to cause its name to be attached to the shelters.  He was the same type of "junior partner" within his organization that Donna was within J&G.

Section 3553(a)(6) requires that the Court take into account "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]"  Rarely will a court be in a position to draw the reliable comparisons that are available in this case, with such similar prosecutions being pursued in a small time frame. Donna, who acknowledged her guilt before this Court and who is comparatively less guilty than

the seven lawyers previously sentenced for similar offenses in this district, should receive a sentence that reflects those facts.

### D.    Just Punishment and Adequate Deterrence

The goals of incarceration are retribution and deterrence.  A significant period of incarceration for a person with Donna's ability and character serves neither interest.  With respect to individual deterrence, § 3553(a)(2)(C) expressly recognizes the need "to protect the public from further crimes of the defendant."  Here, this factor weighs strongly in favor of lenity because she poses no risk to recidivate.  Donna acknowledges the wrongfulness of her conduct and she accepts full responsibility for her actions.  She is acutely aware and truly regretful for the impact her offense has had on the professional tax community, her family, her career, and her reputation.  She is humbled by the loyalty and support that her family, friends, and professional colleagues have shown her during this time, and she is dedicated to never making the errors in judgment that led her to commit a criminal offense.

As for the need "to afford adequate deterrence to criminal conduct" in general, 18 U.S.C. § 3553(a)(2)(B), the goal of making the consequences of participating in tax shelters clear to all has been accomplished by the felony convictions in this case.  Merely by bringing the criminal charges in this and the related cases, the government has made a forceful statement about the importance of integrity in dealing with the IRS.  Anyone – but tax attorneys in particular – could not help but be deterred by the events that have taken place.  In addition to her felony conviction, Donna has lost her law license.  She will never again be allowed to practice in the profession for which she was gifted.  Donna never again will serve as a professional advisor or advocate for any other person.  The days of partnership in a law firm are gone forever.  The ability to earn a salary using her most auspicious talents has been forfeited.

The need for deterrent effect must also be evaluated against the events that occurred during and after this case was prosecuted.  The tax shelter marketplace began to deteriorate even while it seemed to be growing.  The IRS soon was able to identify the various species of tax shelter that were in use and it began to contest their legitimacy.  By 2002 the government had moved across a broad front to shut down the tax shelter marketplace, aggressively auditing wealthy taxpayers, assessing past due taxes and imposing significant penalties on those whose shelters were disallowed.  Unhappy taxpayer clients began to file law suits against the accountants, brokers and lawyers who advised them to get into the tax shelters. The national press reported on the law suits, and in 2002 the United States Senate convened hearings into the prevalence of tax shelters.  Firms like KPMG and Ernst & Young were the most immediate objects of focus by the Senate, but scrutiny soon fell on the role played by brokers and lawyers in executing tax shelter strategies.

 Focus on the tax shelter marketplace caused the IRS to enact significant measures designed to assure deterrence within the tax bar.  The IRS issued revised standards and imposed new requirements addressing the issuance of opinion letters and it amended various treasury regulations to significantly reshape the way law firms approach their work on behalf of tax clients.  This Court need only recall the familiar paragraphs added to e-mail sent by law firms, which admonish the recipient about the limitations imposed by IRS Circular 230.  The actions taken by the Treasury Department since the events of this case effectively have shut down the tax shelter marketplace that was thriving only a decade ago.

The inescapable fact is that this prosecution, and indeed this series of tax shelter prosecutions, roiled the professional tax world for almost a decade.  These cases were the topic of extensive discussion in the national media and in the professional media used by tax lawyers.

The deterrence brought about by these prosecutions has been in place for years and the sentence imposed on Donna Guerin will have a negligible impact on how the tax bar functions in this new environment. A significant custodial sentence is not required to reinforce the deterrent effect of Donna's conviction.

Nor is a significant term of imprisonment required to provide just punishment in this case. To the contrary, the loss of her law license, reputation, ability to start a family, and home; the acceptance of a steep forfeiture charge; and the time and money spent on this case are significant punishments in themselves. Donna has lost almost every material asset that she gained through her work as a tax lawyer. Although it is true that for a few years Donna was compensated very well for her work, her current financial straits are not the product of profligate spending. Instead, a significant amount of her compensation already has gone to the government because she paid income taxes on her professional earnings at the highest tax rate applicable to an individual taxpayer. Additionally, even before the indictment was returned in this case, Donna already had paid $860,000 as a contribution toward a settlement of class-action litigation brought by former clients of J&G. Donna was required to engage counsel early in 2004, when the Department of Justice first began investigating the tax shelter marketplace, and she has paid significant legal fees for nearly a decade, including the very costly process of defending a lengthy criminal case far from her home. Donna bears substantial debts to counsel, she has liquidated savings and investments accounts, and she is financially wiped out because of her involvement in the J&G tax shelter business.

Further, as part of her plea agreement with the government, Donna agreed to forfeit $1,600,000 to the government at the time of sentencing. This forfeiture agreement required that Donna and her husband sell their residence. Because of the condition of the real estate market,

that sale was accomplished at a disappointingly low price and Donna for months has been trying to liquidate virtually all her other available assets to meet the forfeiture requirement of her plea agreement.   These material losses, however, pale in comparison to the heartbreaking consequence of her criminal conviction:  the loss of the ability to adopt a child and start a family.

A just punishment in this case must also be weighed against the backdrop of the tax shelter marketplace.  In determining the appropriate sentence here, it is fair to consider those who avidly pursued tax shelter business, or who willingly entered tax shelters, but who were not charged with any crime.  Donna respects that the agencies of the Executive Branch must decide whether to pursue criminal charges, and against whom they should be pursued.  She respects that there are limits that affect those decisions, such as resources or the quality of available evidence.  Nothing said in this memorandum is intended to complain that Donna was selectively prosecuted or that the decision to charge her was improper.

Nevertheless, the Court must recognize that Donna was brought to justice even as many others escaped that outcome.  Michael Cook, the leader of J&G's tax department, worked with Donna to develop the texts of the opinion letters issued to their clients.  He never has been charged.  Patrick O'Daniel and Bryan Lee of J&G wrote memos supporting the legality of the shelters and marketed those same tax shelters to add to their client lists.  Neither man ever has been charged.  Andreas Kontrimus was a prominent J&G tax attorney who, among other things, introduced his client Michael Hammer (a witness at Donna's trial) to the HOMER tax shelter and assured the client that the shelter should be used.  He never has been charged.  John Beery, an associate at J&G's Chicago office was identified by government witnesses Sandy Burnside and Erwin Mayer as one of the primary architects of the HOMER strategy.  He never has been prosecuted.  John Ivsan, an Ohio attorney who introduced trial witness Dean Kasperzak to tax

shelters, and who served as tax counsel to trial witness Larry Morgan, never has been prosecuted for his actions in promoting tax shelters to those and several other clients.

This list is illustrative, not exhaustive.  There were many other lawyers at many other firms who participated in the tax shelter marketplace in ways that were either indistinguishable from Donna, or that involved conduct that was even more egregious than hers.  There are many other traders, financial advisors, bankers, and accountants who also made small fortunes through their roles in tax shelters that are essentially the same as those used by J&G.  All share one characteristic in common: they have not been charged with any criminal offense as a result of their activities and so they are able to continue their professional lives uninterrupted.

Moreover, Donna is not aware of *any* taxpayer who participated in the J&G shelter who has been subjected to felony charges because he or she did so.  Those hundreds of clients, the millionaires who stood to gain the most from the shelters and whose state of mind was most relevant to determining their propriety, all have come through the experience without ever facing the prospect of prosecution or imprisonment.  In fact, even as this Court imposes sentence on Donna, a few taxpayers continue to litigate against the IRS to avoid paying financial penalties on their sheltered taxes.  These circumstances offer compelling reasons to question whether a significant prison term for Donna will be viewed as providing a "just punishment" when many others, similarly situated and known to the government, have escaped prosecution or punishment for engaging in similar conduct.

E.     The Kinds of Sentences Available

As the PSR notes at paragraph 104, page 28, under 18 U.S.C. § 3561(c)(1), Donna is eligible for not less than one nor more than five years of probation on each count.  A fine or

community service must be imposed as a condition of probation absent a finding of extraordinary circumstances.  See 18 U.S.C. § 3563(a)(2).

Although a fine also is among the potential penalties available, for the reasons previously discussed Donna will not have any ability to pay a fine after she has paid the $1,600,000 forfeiture amount.  Imposition of a fine should be waived in this case on grounds that the defendant lacks the ability to pay a fine.

Restitution potentially could be ordered as part of the sentence but under these circumstances, no order of restitution should be imposed.  First, the plea agreement entered between Donna and the government (at page 2) notes that the government intends to invoke its Restoration Policy and apply some or all the $1,600,000 forfeited by Donna toward restitution. Second, given the complicated facts of this case, the burden of calculating an additional restitution award would unduly complicate and prolong the sentencing process.  In situations like this, federal law does not require imposition of restitution.  18 U.S.C. § 3663A(c)(3)(B).  Like Judge Kaplan in the *United States v. Stein* (KPMG) case, this Court should not require payment of restitution by Donna.  Case 05 Cr. 888, Dkt. 1481.

III.    **Conclusion**

For these reasons, Donna Guerin respectfully submits that the sentence that is sufficient but not greater than necessary to reflect the goals of sentencing under 18 U.S.C. § 3553(a) is a sentence of ten years' probation, with the first 24 months of the probationary term served as home confinement, and such additional conditions as the Court deems appropriate.  Such a sentence is authorized by law, is reasonable in light of all the circumstances known about the offense and the defendant, and will achieve the goals identified in the governing statute.

In any event, and particularly in light of the sentences imposed in this district on others charged in highly similar cases, it is clear that any sentence of imprisonment above 40 months would be inconsistent with the statutory goals, would result in undue sentencing disparity, and therefore would not be reasonable.

Date:  February 18, 2013

Respectfully submitted,

DONNA GUERIN

By: /s/ *Mark L. Rotert*
One of her attorneys

Mark L. Rotert
STETLER, DUFFY & ROTERT, LTD.
10 South LaSalle Street, Suite 2800
Chicago, Illinois 60603
Telephone:  (312) 338-0200
Fax:  (312) 338-0070
mrotert@sdrlegal.com

## <u>CERTIFICATE OF SERVICE</u>

I, Mark L. Rotert, an attorney, hereby certify that *Defendant Donna Guerin's Amended Sentencing Memorandum*, was filed and served on all counsel of record via the Court's CM/ECF system on February 18, 2013.

*/s/ Mark L. Rotert*