UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :

UNITED STATES OF AMERICA,                     :

  - v. -                                     :        S3 09 Cr. 581 (WHP)

PAUL DAUGERDAS,                               :
DONNA GUERIN,
DENIS FIELD, and                             :
DAVID PARSE,
                                              :
               Defendants.
                                              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S SENTENCING MEMORANDUM
## <u>REGARDING DEFENDANT DONNA GUERIN</u>


PREET BHARARA
United States Attorney for the Southern
District of New York

STANLEY J. OKULA, JR.,
NANETTE L. DAVIS,
Assistant United States Attorneys

    - Of Counsel -

**TABLE OF CONTENTS**

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.  Relevant Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

   A.  The Defendants' Educational Background and Work History. . . . . . . . . . . . . . . . . . . . 2

   B.  The Offense Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      1.  Guerin's Participation in the Fraudulent John Martin Tax Shelter. . . . . . . . . . . . . . 3

      2.  Guerin's Participation in the Fraudulent Backdating of Transactions. . . . . . . . . . . 5

      3.  Guerin's Role As a Manager and Supervisor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      4.  Guerin's Signing of a Fraudulent Opinion Letter for Mayer. . . . . . . . . . . . . . . . . . 7

   C.  The Indictment, Trial, New Trial Ruling, Guilty Plea, and the PSR. . . . . . . . . . . . . . . 7

   D.  The Objections to the PSR. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

   E.  Restitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II.  Sentencing Guidelines Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III.  3553(a) Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      1.  The Nature and Circumstances of the Offense. . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      2.  History and Characteristics of the Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      3.  The Need To Afford Adequate Deterrence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      4.  The Need To Avoid Unwarranted Sentence Disparities. . . . . . . . . . . . . . . . . . . . . 23

      5.  The Appropriate Sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :

UNITED STATES OF AMERICA,                     :

  - v. -                                     :          S3 09 Cr. 581 (WHP)

PAUL DAUGERDAS,                               :
DONNA GUERIN,
DENIS FIELD, and                             :
DAVID PARSE,
                                              :
              Defendants.
                                              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM
## REGARDING DEFENDANT DONNA GUERIN

The United States respectfully submits this memorandum for the Court's consideration in connection with the sentencing of defendant Donna Guerin ("Guerin" or "the defendant"), which is scheduled for March 1, 2012.

### Preliminary Statement

On September 13, 2012, Guerin pleaded guilty to two counts related to her involvement in one of the largest tax fraud conspiracies ever charged, the details of which are spelled out in the indictment against her, S3 09 Cr. 581 (WHP), and which was the subject of a three-month trial in 2011. Count One charged Guerin and others with conspiring to defraud Internal Revenue Service (Count One), to commit tax evasion, and commit wire fraud — all in connection with the design, marketing, implementation, and defense of four tax shelters known as Short Sale, Short Option, SWAPS, and HOMER. Count Eight charged Guerin with tax evasion in connection with the Short Option tax shelter of Jenkens & Gilchrist client Larry Moore during the 2000 tax year.

The proof at trial demonstrated that Guerin — a certified public accountant and attorney with a masters of law in taxation — participated as a key actor in the largest criminal tax fraud in history, That fraud, which featured Guerin's involvement in four fraudulent tax shelters that spanned almost a decade, resulted in the creation of over $7 billion of fraudulent tax deductions or benefits, $1.5 billion in Guidelines tax loss, and well in excess of $92 million in actual loss to the United States Treasury. Guerin's involvement in the fraud, principally as a marketer, saleswoman, and implementer of the tax shelters, also resulted in the receipt of extraordinary proceeds to her — over $17 million.

For the reasons spelled out below and in the Probation Department Presentence Investigation Report ("PSR"), we submit that Guerin's conduct, and the resulting harm, is especially deserving of a significant prison sentence.

## I.     RELEVANT FACTS[1]

### A.     Defendants' Educational Background and Work History

Guerin obtained her law degree from DePaul University in 1984 and received her LLM in taxation from the same school in 1994.  PSR ¶¶ 89-90.  After working at a small Chicago-based law firm for a number of years, Guerin joined Altheimer & Gray in 1987 where she became a partner in the tax department.   Guerin joined co-defendants Paul Daugerdas and Erwin Mayer in their departures from A&G in late December 1998 to join J&G as "shareholders" — effectively, partners — in J&G's Chicago office. Guerin served as a J&G shareholder throughout through in or about 2004..

---

[1]   The facts described in this section are based on the Probation Department's Presentence Report ("PSR"), the trial record, documents that the Government has produced to the defendant in discovery, and Government interviews of various witnesses.

B.    **The Offense Conduct**

The facts concerning Guerin's offense conduct will not be repeated herein at length, as those facts are comprehensively set forth in the trial record, the PSR, and the defendant's guilty plea. Accordingly, we are confident that, as a result of the foregoing and the submissions made by the parties, the Court is thoroughly familiar with the magnitude and nature of the defendant's criminal conduct.

Several aspects of that offense conduct bear emphasis, however, as they speak volumes about Guerin's involvement in the tax fraud and the sheer brazenness of aspects of Guerin's conduct.

1.    **Guerin's Participation in the Fraudulent John Martin Tax Shelter**

Guerin's role in the tax shelter transaction of trial witness John Martin graphically illustrated a number of aspects of the tax shelter fraud in general, as well as Guerin's role: the cookie-cutter nature of the tax shelter opinions; the falsity of the representations contained in those opinions; the corrupt relationship between the J&G attorneys and Deutsche Bank employee David Parse; and the true motivations of the tax shelter participants — to obtain staggering tax losses and not to invest in the financial contrivances that were embedded in the transactions.

Martin was a J&G client who was introduced to Guerin by a banker at First Union Bank in Charlotte North Carolina, as well as KPMG accountants there.  As Martin made clear through his testimony at trial, the purpose of the introduction to Guerin — who served as J&G tax shelter "point person" with respect to KPMG — was to explore a way to eliminate the taxes on the gain Martin had experienced as a result of the sale of his computer software company.  As a result of the introduction, in or about September 1999, Guerin sold Martin a Short Sale tax shelter transaction for the specific purpose of eliminating Martin's taxes.

During the course of the sale, Guerin advised Martin about the structure and implementation of the tax shelter and its related short sale of Treasury notes.[2]  However, in November 1999, after the Short Sale tax shelter had been initiated, Martin noticed on his Deutsche Bank account statements that the "investment" that had been effectuated through his Deutsche Bank account was not the Treasury short sale that had been briefly explained to him, but, instead, the purchase and sale of digital currency options, about which he knew nothing.  After Martin reached out via fax to Guerin about his confusion over the nature of the tax shelter, Martin was put in contact with David Parse, who, *after the fact*, provided a brief explanation of the digital options involved in a Short Option tax shelter.

Unfazed by the fact that her tax shelter client had been put into a purported investment transaction about which he knew nothing, Guerin — who had implemented the digital option aspect of the shelter — subsequently issued Martin a boilerplate J&G opinion letter and other paperwork that described Martin as if he were aware of, and agreed in advance to execute, a Short Option tax shelter — which was demonstrably untrue.  Guerin's opinion letter for Martin represented that Martin had formed and stated various beliefs about digital currency options investments[3] when, in truth and fact, as Guerin knew, Martin could not have had such beliefs because he did not even know

---

[2]  The testimony of Erwin Mayer and other trial witnesses made clear that the expected short-term duration of the Treasury note transactions, combined with the lack of volatility of the specific Treasury notes chosen for the transactions, meant that the short sale was virtually certain to produce only a small loss or gain on this purported "investment."

[3]  As the Court heard from numerous tax shelter clients during the trial, those representations included that the client represented that he entered into the Transaction for "substantial nontax business reasons," including Martin's purported belief that that "the most direct way, with the most leverage, to realize gain from expected changes in currency prices was the purchase and sale" of the digital currency options.  GX 55-1.

he was invested in the digital options or implementing a short options tax shelter until well after the fact.

Martin ultimately reported the fraudulent losses from the J&G short options tax shelter on his tax returns and decided not to participate in the IRS's amnesty program, rolling the dice that he might escape audit.  His roll of the dice paid off, resulting under-reporting of millions in taxes that remain unpaid to this day.

### 2.    Guerin's Participation in the Fraudulent Backdating of Transactions

As detailed in paragraphs 45-53 of the PSR, Guerin's conduct involved not only the design, marketing, and implementation of the fraudulent J&G tax shelters, but also fraudulent backdating of certain of those transactions when she and others at J&G realized that the shelter had been implemented incorrectly, or not consistent with the clients' wishes with respect to the amount or nature of the tax loss.

The facts concerning all of the backdating will not be repeated at length herein.  It is useful to note, however, the following aggravating facts as they relate to Guerin: (i) Guerin participated in the backdating together with others at J&G, including Daugerdas and John Beery, as well as David Parse of Deutsche Bank; (ii) beyond the instances of backdating in the PSR, the trial record reflects that Erwin Mayer discussed with Guerin certain backdating done by Mayer in one of his own client transactions (Tr. 2538-39), as well as alterations made by Mayer of Deutsche Bank account statements that referred to fees paid by the clients to J&G (Tr. 2724-26); (iii) all of the incidents of backdating that are detailed in the PSR resulted in the fraudulent tax reporting of the tax shelter results by the clients; and (iv) when Guerin made certain proffer statements to the Government, she falsely claimed that she could not recall any incidents when tax shelter transactions were back-dated

or corrected.

Whatever can be said about the pervasive nature of the tax shelter industry in the late 1990's and early 2000's and the purported effect of that pervasiveness on Guerin's conduct (which Guerin uses as a quasi-excuse for her conduct), it simply cannot be said that fraudulent backdating of transactions was prevalent or even arguably permissible. Basic principles of tax reporting — such as the annual accounting rule — prohibit the changing of tax results through transactions carried out after the close of the tax year. Given this clear legal imperative, Guerin's willingness to participate in such conduct can only be viewed as brazen misconduct.

### 3. Guerin's Role as a Manager and Supervisor

Guerin's role as a manager and supervisor of the criminal activity is deserving of special consideration by the Court. That is so because Guerin's supervisory activities related largely to junior attorneys at J&G, who were tutored by Guerin regarding the fraudulent aspects of the transactions in order to facilitate their participation in the assembly line production of deal documents and opinion letters. One vivid episode involved the tax shelter tutorial given by Guerin to J&G associates from Texas and elsewhere in or about early 1999, when Guerin described how the use of an LLC in the Short Sale transaction was part of a "hide the ball" strategy — that is, designed to reduce audit risk by having any tax reporting document sent to an LLC (which had its own taxpayer ID number) rather than the individual taxpayer involved in the transaction. (Tr. 2356-57). Some of the J&G associates who attended that meeting were later involved in the sale of the fraudulent tax shelters or the fraudulent tax reporting that occurred.

Clearly, any supervisory activities that essentially guided junior attorneys in the fraud should be considered an especially aggravating factor.

6

### 4.    Guerin's Signing of a Fraudulent Tax Opinion for Mayer

In addition to drafting opinion letters that contained false representations about hundreds of tax shelter clients' purported reasons for entering into the transactions, Guerin signed a fraudulent opinion letter for Erwin Mayer's personal transaction for the 2000 tax year.  Mayer had drafted the opinion letter and had inserted all the standard false client representations; he asked Guerin to sign it, which she agreed to do without making any inquiry of Guerin regarding Mayer's purpose for entering into the transaction.  Through this routine agreement to lend her name to a tax opinion that produced fraudulent losses for Mayer, Guerin demonstrated how she was willing, in an almost matter-of-fact fashion, to accommodate a co-conspirator.  (Tr. 2782-83)

### C.    The Indictment, Trial, New Trial Ruling, Guilty Plea, and the PSR

As a result of Guerin's offense conduct, the grand jury returned a third superseding Indictment charging both Guerin, Daugerdas, Mayer, Parse, and Brubaker in thirty-one counts. Guerin in particular was charged with the aforementioned conspiracy to the defraud the IRS (Count One), as well as nine counts of tax evasion relating to the tax shelter transactions of nine separate tax shelter clients (Counts Eight, Twelve, and Thirteen-Nineteen).  Guerin was also charged in Counts Twenty and Twenty-Five with engaging in a corrupt endeavor to obstruct and impede the IRS and mail fraud, respectively, essentially through the same conduct underlying the Count One conspiracy charge.

On February 28, 2011, trial commenced against Guerin and her co-defendants.  On May 25, 2011, the jury found Guerin guilty on all the counts she faced.  Following the Court's ruling in connection with the defendants' motion for a new trial based on juror misconduct, Guerin entered into an agreement with the Government pursuant to which Guerin pleaded guilty to Counts One and

7

Eight.  As a result of Guerin's plea, she faces a maximum of ten years in prison.

In connection with the sentencing of Guerin, the Probation Office has prepared a Presentence Investigation Report (the "PSR"), which calculates the defendant's Sentencing Guidelines offense levels.  As calculated by Probation, and without objection by Guerin, the final offense level is 40, calling for a Sentencing Guidelines sentence at the statutory maximum, 10 years' imprisonment.  PSR ¶ 97.  The breakdown of Guerin's Guidelines calculation is as follows:

- A base offense level of 36 pursuant to §§ 2T1.9, 2T1.1, and 2T4.1(tax table).  PSR ¶ 63.

- An increase of 2 levels pursuant to U.S.S.G. § 2T1.1(b)(2) because the offense involved sophisticated means.  PSR ¶ 63.

- An increase of 2 levels pursuant to U.S.S.G. § 2T1.9(b)(2) because the defendant was involved in conduct intended to encourage persons other than or in addition to co-conspirators to violate the Internal revenue Laws.  This conduct involved encouraging hundreds of tax shelter clients to violate the tax laws.  PSR ¶ 64.

- An increase of 3 levels pursuant to U.S.S.G. § 3B1.1(s) because the defendant was a manager and supervisor (but not an organizer or leader) and the criminal activity involved five or more persons and was otherwise extensive; accordingly, the Guidelines are increased by 3 levels.  Guerin supervised junior associates at J&G in the preparation of the fraudulent tax returns prepared for the clients and the preparation of fraudulent opinion letters.  Guerin also provided "tutorials" to law firm associates who were enlisted to assist in the sale and implementations of the fraudulent short sales, short options, and swaps transactions.  The criminal conduct was widespread and involved the following criminal actors, among others: Daugerdas; Mayer; Guerin; Bryan Lee; John Beery; Paul Shanbrom; Robert Greisman; Charles Bee; Denis Field; Adrian Dicker; Michael Kerekes: and Patrick O'Daniel.  PSR ¶ 66.

- An reduction of 3 levels pursuant to U.S.S.G. § 3E1.1(a) and (b) because the defendant has demonstrated acceptance of responsibility for her conduct and because she timely notified the Government of her intention to plead guilty sufficiently in advance of the re-trial.  PSR ¶ 69.

Guerin has no criminal history points.  Thus, with a final offense level of 40, Guerin's Guidelines analysis, according to the PSR, yields a final advisory Guidelines range of 292-365

months.   PSR ¶ 98.

**D.     The Objections to the PSR**

As noted above, Guerin has leveled no objections to the calculation of the Guidelines. Guerin's only serious objection to the PSR concerns the facts relating to compensation she received from Daugerdas, pursuant to a secret arrangement entered into with Daugerdas. In particular, Guerin maintains that J&G was not deceived, defrauded, or kept in the dark about any aspect of her compensation, including the monies received from Daugerdas. The facts belie this contention.

In order to understand the untoward aspects of Guerin's secret compensation deal with Daugerdas, it is important to remember certain aspects of Daugerdas's written compensation agreement with J&G. Through that agreement, Daugerdas secured the right to receive (i) 70% of the tax shelter fees that J&G collected on tax shelter transactions in which Daugerdas was the originator or "finder"; and (ii) 50% of the tax shelter fees that J&G collected from tax shelter transactions that were originated by Erwin Mayer and Donna Guerin. Thus, because Guerin had no separate compensation formula with J&G, her origination of transactions resulted in 50% of the fee going to the firm, which would decide at the end of the year how much it wished to pay Guerin based on her originations. On the other hand, if a transaction were originated by Daugerdas, J&G received only 30% of the fee, because Daugerdas had a contractual right to 70%. See GX 201-34 (Daugerdas Compensation Agreement).

Guerin's deception of the firm related to her agreement with Daugerdas that, rather than taking "origination credit" for certain transactions where Guerin was, in fact, the originator (such as those transactions relating to KPMG and referral source Ralph Lovejoy), she would allow Daugerdas to claim full origination credit. (Tr. 3826-27). What this allowed Guerin and Daugerdas to do is the

following: give Daugerdas 70% of the fee rather than 50% (and thus leaving J&G 30% of the fee rather than 50%), and thereafter leave it to Daugerdas — rather than the J&G compensation committee — to determine how much Guerin would be paid as a result of her fee origination.

Stated simply, J&G was deprived of the information the secret Guerin/Daugerdas agreement pursuant to which she was giving Daugerdas full credit and that, as a result, Daugerdas was computing the amount he paid Guerin based on her originations.

### E. Restitution

Guerin argues that she should not be held responsible for restitution because calculation of the restitution amount is too complex and, in any event, no restitution should be ordered because she has agreed to a forfeiture as part of her guilty plea.

Guerin's "complexity" argument should be rejected for the reasons articulated by Judge Baer in the case of Guerin's co-conspirator, Michael Kerekes. See United States v. Kerekes, No. 09 Cr. 137 (HB), 2012 WL 3526608 (S.D.N.Y. Aug. 15, 2012) (rejecting complexity argument in determining that BDO/J&G tax shelter transactions for clients who escaped audit resulted in actual tax loss to IRS of approximately $61 million); see also United States v. Bengis, 631 F.3d 33, 41 (2d Cir. 2011) (vacating district court's finding that determination of restitution amount was unduly complicated and time-consuming). The number of taxpayers comprising the IRS's loss is limited to fifty-three individuals, and the tax loss figures have been conservatively calculated by the IRS at approximately $92 million, as reflected on the restitution chart attached hereto as Exhibit F.[4]

In addition, the fact that Guerin agreed to forfeiture does not mean that the Court should not

---

[4] A disk with the Revenue Agent Reports for each of the individuals listed in Exhibit F will be provided to the Court, the Probation Office, and to defense counsel under separate cover.

10

order restitution.   The Mandatory Victim Restitution Act of 1996 ("MVRA"), Pub. L. No. 104-132,

§ 204(a), 110 Stat. 1227 (1996) (codified as amended at 18 U.S.C. § 3663A), makes restitution for

certain crimes, including certain tax crimes under Title 18, mandatory.  See United States v. Walker,

353 F.3d 130, 133-34 (2d Cir. 2003) (discussing significantly reduced discretion afforded courts in

imposing restitution under the MVRA).  Section 3663A(a)(1) provides that "the court shall order,

in addition to . . . any other penalty authorized by law, that the defendant make restitution to the

victim of the offense . . . ." (emphasis added).  As the Walker court noted, "Under the MVRA, the

court no longer has discretion to deny an award of restitution or to award restitution for anything less

than the full amount of the victim's losses.  The sole discretion left to the sentencing court is to

devise a schedule of payments for the period in which the defendant remains under the sentence."

Id.  Under the MVRA, the court may not consider the defendant's economic circumstances or ability

to pay when ordering mandatory restitution.  United States v. Harris, 302 F.3d 72, 75 (2d Cir.2002)

("[T]he district court was required to order restitution and determine the amount thereof without

consideration of the economic circumstances of the defendant.").

        A defendant who pleads guilty to a conspiracy charge, of course, is liable for restitution to

victims harmed by the conspiracy — in this case, the IRS.  As the Second Circuit has held:

> The MVRA requires restitution where (a) the offense was "committed by fraud or
> deceit" and (b) "an identifiable victim or victims has suffered a physical injury or
> pecuniary loss." 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii), (c)(1)(B). . . .  A 'victim'
> means a person directly and proximately harmed as a result of the commission of an
> offense ... including, in the case of an offense that involves as an element a scheme,
> conspiracy, or pattern of criminal activity, any person directly harmed by the
> defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." §
> 3663A(a)(2).

United States v. Archer, No. 10–4683–CR, 2011 WL 4360013, *16 (2d Cir. 2011).

        In addition, interest due is properly includible in a restitution order.  United States v. Qurashi,

634 F.3d 699, 704 (2d Cir. 2011).  The Internal Revenue Code provides that interest must be paid

on any tax that is not properly remitted to the IRS on or before the due date of the tax.  See 26 U.S.C.

§ 6601.  The rate of interest is prescribed in Section 6621 of the Code.

Thus, Donna Guerin is liable for the full amount of taxes and interest owed to the IRS as a

result of the conspiracy, for which the Government submits she should be liable jointly and severally

with her co-conspirators.

## II.   SENTENCING GUIDELINES DISCUSSION

We are distinctly aware of the Court's intimate familiarity and facility with the Sentencing

Guidelines and the law of sentencing, particularly in this post-Booker age.  We nonetheless think it

helpful to review briefly the governing legal principles in this area.

While the Sentencing Guidelines are no longer mandatory, they nevertheless continue to play

a critical role in trying to achieve the "basic aim" that Congress tried to meet in enacting the

Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar

crimes in similar ways."  United States v. Booker, 543 U.S. 220, 252 (2005); see United States v.

Crosby, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that Booker/Fanfan and

section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or

overlooked at the whim of a sentencing judge.").  The applicable Sentencing Guidelines range "will

be a benchmark or a point of reference or departure" when considering a particular sentence to

impose.  United States v. Rubenstein, 403 F.3d 93, 98-99 (2d Cir. 2005).  In furtherance of that goal,

a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the

applicable category of offense committed by the applicable category of defendant,' the pertinent

Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and

12

the need to provide restitution to victims."  Booker, id. at 260 (citations omitted); see also id. at 264

("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and

take them into account when sentencing.").

Apart from the Sentencing Guidelines, as the Court is well aware, the other factors set forth

in Section 3553(a) must be considered.  Section 3553(a) directs the Court to impose a sentence

"sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two.

That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to
> provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical
> care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court – in determining the particular sentence to impose – to

consider:  (1) the nature and circumstances of the offense and the history and characteristics of the

defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds

of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing

Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the

need to provide restitution to any victims of the offense.  See 18 U.S.C. § 3553(a).

In light of Booker, the Second Circuit has instructed that district courts should engage in a

three-step sentencing procedure.  See Crosby, 397 F.3d at 103.  First, the Court must determine the

applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to

find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence

and all of the facts relevant to the determination of a non-Guidelines sentence." Id. at 112.  Second, the Court must consider whether a departure from that Guidelines range is appropriate.  Id.  Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose.  Id. at 113.  In so doing, it is entirely proper for a judge to take into consideration his or her own sense of what is a fair and just sentence under all the circumstances.  United States v. Jones, 460 F.3d 191, 195 (2d Cir. 2006).

## III.   3553(a) Analysis

Although the Guidelines are, of course, no longer binding, the Guidelines sentence in this case reflects the seriousness of the offenses of conviction and the particular aggravating factors relating to Guerin's conduct.  We respectfully submit that a significant term of incarceration is imperative in order to emphatically promote general deterrence.

### 1.    The Nature and Circumstances of the Offenses

The crimes Guerin committed were literally off-the-charts in terms of the tax harm caused to the United States Treasury and in other regards as well.  In particular, Guerin's crimes, of which she was concededly a manager or supervisor, spanned several years and were unprecedented in the history of tax fraud prosecutions in the amount of fraudulent tax benefits created ($7,397,880,388), amount of Guidelines tax loss caused ($1,592,558,352), and amount of proceeds unlawfully obtained by the principal actors (over $150,000,000).

It goes without saying, of course, that tax offenses are serious, costly, and damaging to our nation's system of taxation.  See United States v. Ture, 450 F.3d 352, 357 (8th Cir. 2006) ("[t]he criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system.").  The Internal Revenue Code, § 6151(a) sets forth the general rule of our voluntary

14

federal tax system: "Except as otherwise provided, when a return of tax is required under this title or regulation, the person required to make such return, shall, without assessment or notice and demand from the Secretary, pay such tax to the internal revenue officer with whom the return is filed, and shall pay such tax at the time and place fixed for filing the return."

The defendant is an attorney (with an LLM in Taxation) and CPA who should be held to the same, if not higher, degree of compliance with the law. As a result of her acumen as an attorney and the role she played in advising clients in connection with tax matters, Guerin had the ability to counsel her clients appropriately so that they could and would comply with the tax laws. Instead, in order to obtain the unprecedented fees that she and her co-conspirators collected, she willingly participated, as an attorney and tax advisor, in hundreds of fraudulent tax shelter transactions.

The seriousness of the defendant's conduct, her supervisory role with respect to junior (co-conspirator) attorneys at J&G, the amount of taxes she personally caused clients to evade, and the exorbitant amount of fees she collected from Daugerdas and J&G in doing so, all support a significant prison sentence. The defendant acted without regard to her responsibilities as a citizen, lawyer, and CPA to adhere to the tax laws of this country, and for that she must be held to account.

Guerin's suggestion that she is somehow less blameworthy for selling fraudulent tax shelters because "everyone was doing it" should be summarily rejected for a number of reasons. First, just as a crack dealer selling crack on a corner with several others cannot find refuge in the argument that "everyone else" on that corner was selling crack, so, too, a corrupt tax professional who knowingly engages in massive tax fraud scheme cannot escape blame because other tax professionals had lost their legal bearings as well. White collar defendants deserve no special treatment.

Second, Guerin is plainly wrong in suggesting that "everyone was doing it." To be sure, tax

15

professionals at KPMG, BDO Seidman, and Ernst & Young were engaged in tax shelter fraud, but those individuals represented a small percentage of the otherwise law-abiding tax professionals in the United States.  Finally, there is absolutely no proof that "everyone" was engaged in the type of shameless backdating of transactions in which Guerin and others engaged.

### 2.     History and Characteristics of the Defendant

While it is certainly appropriate for the Court to consider the defendant's good works, the Government respectfully submits that any credit given them must be balanced against the fact that her ability to perform many such good works resulted directly from the position she achieved and the wealth that he accumulated as a result of the breathtaking fraud of which she was a significant and essential part.

Likewise, the Government submits that any testimonials to the defendant's character and honesty by his family and friends ought to be given little weight.  See United States v. McClatchey, 316 F.3d 1122, 1135 (10th Cir. 2003) ("excellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her").  While there are certainly cases where it can be said that a defendant's offense conduct was in some way wildly aberrant or representative of so brief and isolated a lapse in judgment that it is appropriate to give significant weight to an otherwise blameless life, this demonstrably is not such a case.  For years of her professional life, the defendant participated in what amounted to one of the most audacious tax frauds in history, resulting in a Guidelines losses of over $1.5 billion and over $17 million in income to her.

Even crediting any testimonials she submits at sentencing — and we do not in any way

16

question the sincerity of those testimonials[5] — the defendant, through her sustained criminal conduct at A&G and J&G, has shown that she is not someone who deserves any benefit of the doubt with respect to this Court's judgment of her character.

In short, Guerin's good works and devotion to friends and family are simply overwhelmed by the enormity of her criminal conduct.

### 3.   The Need To Afford Adequate Deterrence

One of the paramount factors the Court must consider in imposing sentence under Section 3553(a) is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). We respectfully submit that a substantial term of imprisonment is vitally necessary to achieve the goals of general deterrence, especially given nature and history of this type of case.

The convictions of Guerin and her co-conspirators occurred as the result of a prolonged investigation that literally took years and vast government resources to complete. Experience has shown that cases of this kind are very difficult to prosecute, for a host of reasons. First, because the transactions appear so complex on paper (usually by design, as in this case), it is often difficult to

---

[5]   While we do not call into question the sincerity of the letters sent on Guerin's behalf, we feel compelled to comment on the letter sent by tax lawyer Barry Nekritz, who worked with Guerin at Altheimer & Gray and currently practices tax law in Chicago. In particular, it is worth noting that Nekritz was not only one of Guerin's tax partners until late 1998, but a personal participant in short sale tax shelters for three successive tax years (1997-99), through which Nekritz generated over $600,000 in fraudulent losses to be employed on his own personal income tax returns. Guerin was the tax return preparer for the S Corporation that Nekritz used in his 1997 transaction, and Guerin also served as the J&G relationship partner with Nekritz for the 1998 and 1999 shelter transactions. Finally, Nekritz, who remained at A&G when Guerin and the others left, served as a tax shelter client referral source for Guerin and J&G, resulting in the payment of $72,800 to Nekritz's firm in connection with one significant tax shelter transaction. Nekritz notes in his sentencing letter that he would be happy to testify at the sentencing proceeding; we, of course, would welcome the opportunity to question Nekritz about his tax shelter dealings with Guerin and the bogus short sale losses Nekritz generated with Guerin's help and claimed on his tax returns.

determine exactly what is going on, let alone to explain it to a jury.

A more fundamental problem in cases like this is that the documents themselves tell only part of the story. Those documents, by design, were intended to deceive — to give the appearance of legitimate, profit-motivated investment transactions that provided tax benefits.  Moreover, the documents, particularly the tax opinions crafted, refined, reviewed, and sold by Guerin and others, recited factual representations ostensibly made by the J&G clients and purporting to confirm those clients' core, investment motivations in pursuing the transactions.  The reality of the fraud scheme lies in the utter falsity of those opinion-letter representations and the secret understandings and agreements among the participants that the transactions were being pursued solely for tax reasons; it is inherent that those falsities and secret understandings can be uncovered only through the testimony of witnesses.  Witnesses, however, have not readily volunteered to cooperate and testify in cases of this kind, in part due to their own legal exposure.

Moreover, there was a remarkable abundance of arrogance in the legal, tax, and financial community that advanced the belief that the creation of an almost impenetrable wall of financial jargon, combined with the surface complexity of the transactions and purported ambiguity of the governing tax doctrines, would make a successful prosecution impossible or exceedingly problematic.  Other commentary advanced the belief that the conduct of Guerin and other tax shelter lawyers and purveyors amounted to nothing more than "aggressive" representation of the taxpayer clients.  The Government respectfully submits that an important — indeed, essential — function of the sentencing in this case is to send a very clear message that those beliefs are profoundly mistaken.  Lying about the nature, purpose, and results of tax transactions is — and has always been — a crime, and one deserving of significant punishment when carried out by tax professionals.

18

Stated differently, meaningful criminal sanctions are essential to stop frauds like those perpetrated by Guerin and her credentialed cohorts, which amounted to nothing less than an assault upon the orderly fiscal operation of this country that depends on every taxpayer paying his or her appropriate share — no more, and no less.  Civil proceedings, legislative efforts to rewrite the tax laws, and even previous criminal prosecutions have proven largely if not completely ineffective in deterring sophisticated, concerted tax shelter architects and implementers like Guerin and her co-conspirators.[6]  Indeed, attorneys in the Tax Division, our Office, and other parts of the country have

---

[6]  There is an obvious reason why civil proceedings and changes in the tax laws have historically proven ineffective in stopping fraudulent tax shelters. A Tax Court decision or a change in the tax law will affect the behavior only of a person who is intent upon acting in conformity with the law. Participants in a fraudulent tax shelter conspiracy like Guerin, however, frequently treated the law as, at most, an annoyance — something that could simply be twisted or trifled with or even flat-out ignored.  A stark example of this is in the treatment by Guerin and her co-conspirators at J&G of the law concerning Section 165(c)(2) of the Internal Revenue Code.  That section disallows deductions from transactions like those involved in the J&G tax shelters unless the transactions were undertaken with the requisite profit motive.  Courts have long construed section 165(c)(2) to require that the underlying transaction was undertaken "primarily for profit." Helvering v. National Grocery Co., 304 U.S. 282, 289 n.5 (1938) ("deductibility of losses under [predecessor to 165(c)(2)] may depend upon whether the taxpayer's motive in entering the transaction was primarily profit"); United States v. Generes, 405 U.S. 93, 105 (1972) (recognizing that profit motive test under 26 U.S.C. § 165(c)(2) requires establishing profit as "dominant" purpose); Austin v. Comm'r, 298 F.2d 583, 584 (2d Cir. 1962) ("This court has repeatedly held that, in determining the deductibility of a loss, the primary motive must be ascertained and given effect"); Arata v. Comm'r, 277 F.2d 576, 578-79 (2d Cir. 1960) (noting Helvering's requirement that profit be the "primary" motive; "since the profit motive was not the primary impetus to the [transaction], it was proper to disallow the deduction"); Dewees v. Comm'r, 870 F.2d 21, 33 (1st Cir. 1989) (Breyer, J.) (under § 165(c) taxpayer must show profit was primary motivation for claiming tax shelter losses); King v. United States, 545 F2d 700, 708 (10th Cir. 1976) ("in order to deduct a loss under §165(c)(2) the taxpayer must show that profit was the primary motivation"); Miller v. Comm'r, 836 F.2d 1274, 1276-77 (10th Cir. 1988) (the term "for profit" in § 165(c)(2) means "primarily for profit"); Yosha v. Comm'r, 861 F.2d 494, 499 (7th Cir.1988) (Posner, J.) (the term "for profit" contained in 165(c)(2) has been "interpreted to require that the 'nontax profit motive predominates'"; "primarily for profit" test not a matter of judicial gloss, but, rather, manifestation of purpose of 165(c)(2): "Forget the gloss: the effort here to turn paper losses into tax benefits was contrary to the original, unembellished purpose of section 165(c)(2)"); Resser v. Comm'r, T.C. Memo. 1991-423, 1991 WL 163536 (1991) ("This Court has

pursued criminal and civil proceedings challenging abusive shelters for years.   While those efforts may have resulted in criminal convictions and, on the civil front, recouped tax revenues for the country, they failed to stop those practices.[7]   Accordingly, substantial criminal sanctions are essential to meaningfully attempt to put an end to these practices.   Put in the most stark but brutally realistic terms, only the real fear of a substantial prison sentence will deter fraudulent shelter promoters, salesmen, and facilitators like Guerin from carrying on their activities and causing their harm.   Otherwise, such promoters will, like their clients, be inclined to roll the dice and bet that the financial benefits of the tax shelters outweigh the likelihood and costs of getting caught.

---

consistently held that in order to deduct a loss under section 165(c)(2) the taxpayer must show that profit was the primary motivation. . . . This does not mean that losses influenced by tax planning are not deductible under section 165(c)(2).  Losses from a transaction entered into partly for tax-avoidance may still be allowable under section 165(c)(2), provided the required non-tax profit motive predominates.  In other words, the tax tail cannot wag the business judgment dog.") (emphasis added).  Yet most of these cases, and their significance with respect to Section 165(c)(2), were ignored in the opinion letters crafted by Guerin and the others.  This was done, of course, because a fair reading and treatment of those cases in the J&G opinion letters would have sounded the death knell for the losses claimed from the J&G tax shelters.

[7]   The failure to deter the promotion and sale of fraudulent tax shelters may be attributable to the relatively light sentences imposed on certain shelter promoters in a previous generation of prosecutions, notwithstanding the gargantuan tax losses generated.  See United States v. Atkins, 869 F.2d 135 (2d Cir. 1989) (lead defendant sentenced by Judge Morris E. Lasker, pre-Guidelines, to two years' imprisonment after being found guilty at trial of generating over $1.3 billion in fraudulent losses; co-defendant sentenced to four months; second co-defendant sentenced to probation); Steve Coll, "Tax Shelter Founder Atkins Is Sentenced to Two Years," *Washington Post*, March 12, 1988 ("Though Atkins faced a maximum of about 85 years in prison, his two-year sentence fell within the range of punishments handed out recently in comparable cases") (article attached as Exhibit A); see also  United States v. Oshatz, 912 F.2d 534 (2d Cir,. 1990) (attorney/defendants sentenced pre-Guidelines to 40 and 28 months, respectively);  United States v. Manko, 979 F.2d 900 (2d Cir. 1992) (pre-Guidelines sentence of five years in case involving over $500 million in false deductions); but see  United States v. Senft, 84-1254 (2d Cir. 1986) (Sentinel tax shelter promoter Michael Senft sentenced by Judge Owen to 15-year pre-Guidelines term of prison, following trial and sentencing at which Senft continued to maintain that shelters were lawful).

Such an approach would be entirely consistent with the Guidelines, which specifically recognize that general deterrence is a vitally important goal in sentencing for criminal tax offenses, due to the relatively few criminal tax prosecutions that are brought. As the Sentencing Commission explained:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. ch 2, pt. T, introductory cmt. See also United States v. Engle, 592 F.3d 495, 502 (4th Cir. 2010) ("Given the nature and number of tax evasion offenses as compared to the relatively infrequent prosecution of those offenses, we believe that the Commission's focus on incarceration as a means of third-party deterrence is wise. The vast majority of such crimes go unpunished, if not undetected. Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path"); United States v. Burgos, 276 F.3d 1284, 1289 n.6 (11th Cir. 2001) (observing "[f]or a judge sentencing a defendant convicted of tax evasion, the chief concern may be general deterrence").

Moreover, in tax prosecutions there is good reason to impose Guidelines sentences as opposed to the more lenient probationary sentences sought by tax evaders. As the Guidelines commentary further explains:

> Under pre-guidelines practice, roughly half of all tax evaders were sentenced to probation without imprisonment, while the other half received sentences that required them to serve an average prison term of twelve months. This guideline is intended to reduce disparity in sentencing for tax offenses and to somewhat increase average

21

sentence length.  As a result, the number of purely probationary sentences will be reduced.

Guideline Commentary, Section 2T1.1.

Our Circuit has echoed the Commission's observations, noting that, "[o]nly a limited number of criminal tax prosecutions are brought relative to the number of alleged violations.  *See* U.S. Sentencing Guidelines Manual ch. 2, pt. 2, introductory cmt." United States v. Trupin, 475 F.3d 71, 76 n.6 (2d Cir. 2007) (seven- month prison sentence for multi-year tax evasion scheme with a tax loss of $1.2 million fails to reflect seriousness of offense).  As the Trupin court aptly observed, a tax evader, is "in effect [stealing] from his fellow taxpayers through his deceptions."  Id. at 76; see also United States v. Taylor, 499 F.3d 94, 102 (1st Cir. 2007) (vacating sentencing of probation with one year in a halfway house for tax fraud offense where tax loss was $129,879 finding that "[w]hile tax fraud is not violent in nature, at its heart, it is theft, specifically theft of money to which the public is entitled").

Judge Weinfeld aptly articulated, in a pre-Guidelines setting, the need for incarceration as a result of the tax evader's violation of the basic compact under which all American income-earners live:

> This court has long had the view that income tax evasion cases where defendants are found guilty, whether upon their pleas of guilty or after jury verdict, require a term of imprisonment.  The income tax laws of our country in effect reflect an honor system under which the citizens are required to cooperate with the government, to file true and accurate returns.  I have been of the view that unless a citizen lives up to his responsibility there must follow, barring an extraordinary situation, a term of imprisonment as an example to other people in the community.

United States v. Tana, 85 Cr. 1119 (EJW) (June 17, 1986; Tr. at 12-13) (relevant pages attached hereto as Exhibit B).  In a recent case involving a defendant who utilized an undeclared Swiss bank

containing millions of dollars and that resulted in hundreds of thousands of dollars of tax loss and

a Sentencing Guidelines range of 24 to 30 months (facts that are different from those present here),

Judge Gardephe echoed Judge Weinfeld's sentiments in a manner applicable to this case:

> Our tax system is, at bottom, a voluntary one. Those who use sophisticated means
> of tax evasion, the sorts of sophisticated means seen here, when their activities come
> to light they must be punished in a manner that will discourage others from engaging
> in similar conduct. I believe in the views of Judge Weinfeld, for whom I have the
> greatest respect, and specifically his views as expressed in the case of United States
> versus Tana, that absent extraordinary circumstances, cases of significant tax evasion
> often call for a sentence of imprisonment. There's nothing about the facts here that
> suggest to me that a different outcome is appropriate.

United States v. Werdiger, 10 Cr. 325 (PGG) (November 9, 2011; Tr. at 49-50) (relevant pages

attached hereto as Exhibit C). And this Court, too, has specifically recognized the important role

of general deterrence given the relative scarcity of criminal tax prosecutions. See United States v.

Mullahy, 10 Cr. 554 (WHP) (November 23, 2010; Tr. 10) (relevant pages attached hereto as Exhibit

D) ("Looking at the 3553(a) factors in this case, the Court agrees with the Government that tax

crimes are not prosecuted frequently and, therefore, there is a need for deterrence.").

In sum, general deterrence in cases like this can be accomplished *only* through a meaningful

term of incarceration.

### 4.    The Need To Avoid Unwarranted Sentence Disparities

The Sentencing Guidelines were promulgated, in part, to minimize disparities in federal

sentences. Although those Guidelines are no longer mandatory, the importance of eliminating

sentencing disparities remains an important factor which the Court must separately consider pursuant

to 18 U.S.C. § 3553(a)(7). We attach for the Court's consideration a chart of sentences in other tax

cases, including ones with comparable loss amounts. See Exhibit E (the "Sentencing Chart"). The

Sentencing Chart breaks out the sentences imposed and various other sentencing data in a broad variety or criminal tax contexts, including, most pertinently, tax shelter prosecutions.

Although we believe that there is significant utility in the Court considering what has happened in other cases, we hasten to note our acute awareness that, at best, such guidance can get the Court only so far. Every case is unique; every individual defendant is unique. We do not mean to suggest otherwise. The reasons for referencing the other sentences are straightforward: first, while we fully recognize that what we believe to be an appropriate application of the Sentencing Guidelines leads to an advisory Guidelines range calling for a very substantial sentence, similar sentences have been meted out in cases involving comparable overall conduct and tax losses; and second, it is not uncommon for defendants who are less criminally culpable than Guerin to receive and serve lengthy sentences of incarceration.

Contrary to the argument suggested by Guerin in her sentencing memo, the universe of tax shelter sentences that the Court should consider when fashioning Guerin's sentence should not be limited to those stemming from the KPMG (United States v. Stein, 05 Cr. 888 (LAK)) and Ernst & Young (United States v. Coplan, 09 Cr. 555 (SS)) tax shelter cases. Guerin has set forth no persuasive argument why the tax shelter sentences imposed in the Stein and Coplan cases are the only ones the Court should consider when weighing the appropriate sentence in a case involving, among other things, conduct designed to encourage hundreds of others to violate the tax laws. See Guerin PSR ¶ 64 (citing to upward adjustment of Guerin's Guidelines calculation because Guerin was involved in conduct intended to encourage persons other than or in addition to co-conspirators to violate the Internal Revenue Laws). In fact, no persuasive argument exists, as the proper prism through which the Court should view its statutory mandate to avoid unwarranted sentencing

disparities is one that considers tax shelter fraud sentences on a nationwide basis, not simply within a single district. See United States v. Snyder, 136 F.3d 65, 68-70 (1st Cir.1998) (explaining that the phrase regarding the need to avoid "unwarranted sentencing disparities" in the Sentencing Guidelines reflects a "concern with variations among federal courts across the nation, without reference to their state counterparts," and that the "[G]uidelines seek to perform uniform sentencing among federal courts in respect to federal crimes").

That is not to say, of course, that the Stein and Coplan cases do not provide some indications of what certain Southern District Judges determined to be the appropriate sentences, based on the unique facts of those cases. In that regard, it is important to note certain critical distinctions between the facts of this case and those involved in Stein and Coplan. First, Stein involved $111 million in Guidelines tax losses, while this case involves almost fifteen times that amount — over $1.5 billion. Second, the defendants in Stein were convicted of participating in one fraudulent tax shelter — BLIPS[8] — while Guerin's conviction here is predicated principally on a conspiracy charging four separate tax shelters sold for almost six years by Guerin and others. It is also useful to note that, despite those distinctions, the critical actors in the Stein case — Larson, Pfaff, and Ruble — received sentences of 120, 97, and 78 months, respectively.

With respect to the Coplan case, there are certain similarities in the underlying conduct: four tax shelters were involved in each case, and the conduct occurred roughly at the same time Guerin and her co-conspirators were engaged in the Short Options Strategy and HOMER. In fact, there was

---

[8]  BLIPS was an acronym for the Bond Linked Issue Premium Structure, a Son-of-Boss tax shelter that was predicated on the same "contingent liability" tax play as the short sale, short option, and SWAPS tax shelters.

25

an overlap with <u>Coplan</u> with respect to the COBRA tax shelter, which Daugerdas and Guerin participated in (largely as opinion letter writers) with Ernst and Young at the same time they were involved in the charged conspiracy. There were also critical distinctions, however, including the fact that the <u>Copaln</u> indictment charged tax evasion offenses only with respect to one of the tax shelters involved (CDS Add-On). Thus, the case was tried not principally on a lack-of-economic-substance theory but on the theory that the defendants engaged in a conspiracy to lie to the IRS and others about the operation of the Ernst & Young tax shelter transactions and the reasons why the clients entered into them. Finally, the Ernst & Young partners who were convicted in the case did not engage in the back-dating of tax shelter transactions and did not receive anywhere near the gargantuan fees collected by Daugerdas, Guerin, and Mayer. Indeed, the Ernst & Young defendants basically collected their partnership compensation, which did not include a percentage of the fees charged to the clients.

In addition to the <u>Stein</u> and <u>Coplan</u> sentences, we respectfully suggest that the sentences imposed in the Bank One, Aegis, Security Trust, American Rights Litigators, and Anderson Ark tax shelter cases are worthy of consideration, since those cases, like this one, involved the sale of tax shelters or tax evasion packages to numerous taxpayers. As the Sentencing Chart makes clear, those cases involved sentences of between 96-240 months for many of the defendants, based on Guidelines tax losses that ranged from $7.5 million to $120 million — fractions of the tax loss here.

### 5.     The Appropriate Sentence

The Government submits that a sentence of 10 years is appropriate for Guerin. Although the sentence is at the statutory maximum for each of the counts of conviction, the sentence is less than half of the Guidelines range. Such a sentence will best serve the ends of justice pursuant to 18

U.S.C. § 3553(a).  Such a sentence is also commensurate with others charged with the most serious and sustained tax and financial institution crimes.

Any argument or suggestion that the defendant has been punished enough by the likely loss of her law license should be rejected.  According to this logic, one who is professionally licensed should not be sent to jail for committing the same crime that would justify a sentence of imprisonment for a less well-heeled and well-educated defendant.  We respectfully suggest that the Court should reject the notion that the professionally educated should be sentenced more lightly than the poor or powerless or less-effectively-represented because, for the former, the humiliation and shame of conviction alone is more devastating than it would be for those who have enjoyed fewer advantages in life.

We respectfully submit that a substantial term of imprisonment is warranted for both general and specific deterrence reasons, would reflect the seriousness of Guerin's fraudulent conduct, and would promote respect for the law.  An attorney or professional contemplating the potential fruits of massive fraudulent conduct should see and know that a significant jail term is its likely consequence.  A term of probation for Guerin's crimes, or even one that includes a home confinement component, on the other hand, would rightly be perceived as a slap on the wrist and would serve to deter no one.

## CONCLUSION

"Taxes," wrote Oliver Wendell Holmes, "are what we pay for civilized society. . . ." Compañía General de Tabacos de Filipinas v. Collector of Internal Revenue, 275 U.S. 87, 100 (1927) (Holmes, J., dissenting).  The orderly financial functioning of this country depends largely upon voluntary compliance with the internal revenue laws by all citizens, regardless of wealth or status

27

or who their tax lawyers or accountants might be.  That system of voluntary compliance would crumble if lawyers and other professionals who engage in massive tax fraud schemes believed they could cheat with impunity or that the most severe sanctions that they would face when caught were merely the payment of financial penalties and the loss of a law license, together with the probationary/home confinement sentence that Guerin asks for here — the relative equivalent of a slap on the wrist.

Substantial imprisonment is essential in a case like this, lest the fraud perpetrated by the defendant breed skepticism and bitterness among hard-working American taxpayers who fulfill their tax obligations by paying their taxes honestly and who do not have the financial wherewithal or sophistication to utilize tax shelters and their corrupt purveyors to evade their tax obligations.  On the unique facts of this case, a sentence at or close to the statutory maximum is entirely appropriate.

Dated:   New York, New York
         February 22, 2013

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney
                              Southern District of New York


                         By:    s/Stanley J. Okula, Jr.
                              STANLEY J. OKULA, JR.
                              Assistant United States Attorney
                              (212) 637-1585
                              stan.okula@usdoj.gov
                              NANETTE L. DAVIS
                              Special Assistant United States Attorney
                              (212) 637-1117
                              nanette.l.davis@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that paper copies will be sent to those indicated as non registered participants on the above date.

By:     s/Stanley J. Okula, Jr.
STANLEY J. OKULA, JR.
Assistant United States Attorney
(212) 637-1585
stan.okula@usdoj.gov