```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA

 4               v.                        09 Cr. 581 (WHP)

 5    DONNA M. GUERIN,
                                           Sentence
 6                   Defendant.

 7    ------------------------------x

 8                                         New York, N.Y.
                                           March 1, 2013
 9                                         2:00 p.m.

10    Before:

11          HON. WILLIAM H. PAULEY III

12                                         District Judge

13
                  APPEARANCES
14

15    PREET BHARARA
           United States Attorney for the
16         Southern District of New York
      STANLEY J. OKULA
17    NANETTE DAVIS
      JASON P. HERNANDEZ
18         Assistant United States Attorney

19
      MARK ROTERT
20         Attorney for Defendant

21
      CHRISTINE MAZZELLA
22         Special Agent - IRS

23

24

25
```

```
1                (Case called)

2                THE CLERK:  Appearances for the government.

3                MR. OKULA:  Good afternoon, your Honor.  Stanley Okula

4    and Nanette Davis and Jason Hernandez for the government.

5    Seated at counsel table is Special Agent Mazzella from the IRS,

6    with whom I believe your Honor is familiar.

7                THE COURT:  Good afternoon.

8                THE CLERK:  Appearance for the defendant?

9                MR. ROTERT:  Good afternoon, your Honor.  Mark Rotert

10   here for the defendant Donna Guerin, who is present here in

11   open court.

12               THE COURT:  Good afternoon, Mr. Rotert.  I note the

13   presence of Ms. Guerin at counsel table.

14               This matter is on for sentencing.  Are the parties

15   ready to proceed?

16               MR. OKULA:  We are, your Honor.

17               MR. ROTERT:  Yes, your Honor.

18               THE COURT:  Mr. Rotert, have you reviewed with your

19   client the pre-sentence investigation report?

20               MR. ROTERT:  I have, your Honor.

21               THE COURT:  Are there any factual matters set forth in

22   the report that you believe warrant modification or correction?

23               MR. ROTERT:  Yes, your Honor.  If I may approach the

24   podium, your Honor?

25               THE COURT:  You may.
```

1           MR. ROTERT:  Your Honor, I'm sure the Court has a copy

2    of the revised pre-sentence investigation report.  If I could

3    direct the Court's attention to page 28 of that document, sir.

4    Your Honor, page 28 has a paragraph 95 that is captioned as

5    "Financial Condition:  Able to pay."

6           THE COURT:  Yes.

7           MR. ROTERT:  I'd like to offer a couple of corrections

8    to this report that I think are a product of trying to fill out

9    forms and communicate correctly in a moving environment.

10          On the listing of assets for Ms. Guerin, you will see

11   under "Transfer of assets," I think it is about the fifth entry

12   down, it says various pieces of fine jewelry and it values them

13   at $65,500.

14          THE COURT:  I see that.

15          MR. ROTERT:  Your Honor, that jewelry was sold by Ms.

16   Guerin.  She no longer owns it.  The proceeds of that actually

17   make up a part of the bank account at the top for Suburban Bank

18   & Trust, the $117,000 amount.  That $117,000 amount includes

19   proceeds from the sale of that jewelry, but the jewelry is no

20   longer an asset of hers.  I would request that we back out that

21   $65,500 figure.

22          THE COURT:  Any objection to that?

23          MR. OKULA:  None at all, your Honor.

24          THE COURT:  I'm striking the line "transfer of assets"

25   and will subtract that from the total assets.  Have you done

the math?

        MR. ROTERT:  I haven't, your Honor, because I'm not

quite done with the adjustments.

        THE COURT:  All right.

        MR. ROTERT:  Your Honor, I would also indicate for the

second and third entries under Ms. Guerin's assets, the IRAs,

those certainly are assets Ms. Guerin possesses.  But as I am

sure you are aware, until she reaches the age of 59½, those

would not be accessible at their face value.  There would be

tax penalties associated with any effort to cash those in such

that for purposes of what is an available asset to her today,

the number is about $230,000 as opposed to the aggregate sums

there.  Your Honor, by virtue of my modest abilities to do

math, I believe that Ms. Guerin's net worth right now is a net

worth of negative $122,000, approximately.

        THE COURT:  Does the government have any reason to

dispute that?

        MR. OKULA:  We don't, your Honor.  We recognize, and I

think Mr. Rotert is entirely right, that the face value is

premised on the notion of immediate access and that the IRA

rules do envision reaching the appropriate age to get that face

value.  So we have no problem with the adjustment of the

numbers as Mr. Rotert suggests.

        THE COURT:  Very well.

        MR. ROTERT:  Your Honor, if I can then direct the

Case 1:09-cr-00581-WHP   Document 601   Filed 03/14/13   Page 5 of 58

1     Court's attention to the next page of the pre-sentence report,

2     paragraph 97.  The Court will see that the report lists the

3     assets held by Tom Guerin, Ms. Guerin's husband.  That first

4     line there for bank accounts, your Honor, the proceeds of the

5     sale of Ms. Guerin's home were in that bank account at the time

6     that figure was set forth.

7            As the Court I'm sure is aware, those proceeds now

8     have been disbursed to the government in connection with the

9     forfeiture agreement that Ms. Guerin reached as part of her

10    plea agreement.  The actual net worth total for Mr. Guerin

11    right now is approximately $1,272,000, and the difference

12    relates to the expenditure that was made for purposes of

13    securing the forfeiture amount.

14           I would also like to note for the Court and for the

15    record that prior to the proceedings beginning this afternoon,

16    I did tender to government counsel a bank check issued by Ms.

17    Guerin for $1.6 million in satisfaction of the agreement she

18    reached as to forfeiture.

19           THE COURT:  All right.

20           MR. ROTERT:  Your Honor, I have no other suggested

21    requests or corrections to the pre-sentence investigation

22    report.

23           THE COURT:  Before you sit down, I have a question.

24    There were substantial transfers of funds to a trust set up in

25    the name of Ms. Guerin's husband.

1          MR. ROTERT:  Yes, your Honor.

2          THE COURT:  Where is that money?

3          MR. ROTERT:  Your Honor, the money that was in the

4    trust has been used for their residence, including the

5    acquisition of a side lot, for improvements to their residence.

6    A significant amount of money was spent on the legal fees and

7    costs associated with this prosecution.  But Mr. Guerin's net

8    worth, including the trust assets, is as correctly noted now

9    after my corrections on the pre-sentence investigation report.

10         THE COURT:  There were millions of dollars in the

11   trust.

12         MR. ROTERT:  Your Honor, as you know, roughly

13   $8 million of the total received by Ms. Guerin was paid in

14   taxes.

15         THE COURT:  Right.  But she received $18 million.

16         MR. ROTERT:  Right.  Your Honor, the balance of the

17   money was used for the various expenses and costs that I have

18   noted with respect to her personal home, with respect to her

19   legal fees and expenses, and that money is just the money that

20   they have been living on.  I don't know which specific amounts

21   or which specific transfers the Court is focused upon.  I'm not

22   sure if I'm answering the Court's question.

23         THE COURT:  I'd just like a 30,000-foot flyover.  What

24   happened to $10 million when I'm told that she's living so

25   modestly?  She didn't spend $10 million on a house and

7

D3lsgue6

1      maintaining it in Illinois.

2              MR. ROTERT:  There was a lot of money put into the

3      house that never came back in the sale that was transacted.

4              THE COURT:  How much?

5              MR. ROTERT:  I'll see if I can give it to you.

6              THE COURT:  Thank you.

7              MR. ROTERT:  Your Honor, it's an amalgam of various

8      things, but let me give you some examples.  Ms. Guerin and her

9      husband have been paying for the medical care and the assisted

10     living of Ms. Guerin's mother.  They have also had substantial

11     medical expenses for another relative of Mr. Guerin that they

12     have absorbed.  Ms. Guerin herself, as the pre-sentence report

13     indicates, underwent a very extensive and very expensive series

14     of medical treatments both in vitro fertilization efforts and a

15     hysterectomy, so she had some very, very substantial medical

16     expenses over this period of time.

17             Judge, there were some assets, a substantial number of

18     assets, that were acquired but then had to be auctioned off for

19     purposes of meeting the financial obligations here.  For

20     example, she got about $65,000 worth of cash income from the

21     sale of jewelry that was 4 or $500,000 of expenditure.

22             They purchased some artworks on the belief that the

23     value of those artworks would appreciate.  They spent 6 figures

24     to obtain artworks.  When they sold them for purposes of

25     gathering their assets together, they didn't get anywhere close

8

D2lsguo9

 1    their amount of money back.  And they took a beating in

 2    investments at the same time that the rest of us took a beating

 3    in our investments.

 4         Your Honor, Mr. Guerin's trust was the subject of

 5    grand jury subpoenas from the government.  There is nothing

 6    that is secret about the financial activities of the defendant.

 7    Before we reached agreement on the forfeiture amount, we

 8    supplied the government with financial information so that they

 9    could have a real-time picture into what the situation was with

10    respect to her financial state.

11         The report, the pre-sentence investigation report as

12    corrected, is a correct rendition of her circumstances now, and

13    the expenditures that have been taking place were expenditures

14    for family, for medical, for personal use, and for the

15    residence.

16         THE COURT:  I'll ask the government whether the

17    government is satisfied with the accounting.  It's difficult

18    for this Court to accept that since 2003 $10 million has

19    vaporized into the ether.  That's just my rough math.  Mr.

20    Okula?

21         MR. OKULA:  Your Honor, we did make the inquiry of

22    counsel.  We do see the numbers that your Honor is seeing.  I

23    think one slight adjustment to give Mr. Rotert sort of credit

24    for the argument that he is making is the $10 million sort of

25    plus position I think goes back to the '98 period, so it goes

 1    from '98 to 2003, so the cost of living expenses over that time

 2    frame.

 3            We, truth be told, were at a loss a little bit over

 4    the overall accounting.  That's why we did issue grand jury

 5    subpoenas, we did inquire about the trust.  There is a number

 6    of millions of dollars that came out of the trust that we

 7    haven't been able to trace.

 8            THE COURT:  Like $3.2 million on February 18, 2004,

 9    correct?

10            MR. OKULA:  Correct, your Honor.  It ended up to be

11    something that we simply couldn't track down at the end of the

12    day, your Honor.  We don't have any information that can

13    positively gainsay anything about the numbers, but we share the

14    Court's sort of puzzlement about where the money went.

15            MR. ROTERT:  Your Honor, I think it is correct, as Mr.

16    Okula helpfully notes, that these numbers, as far as I can

17    tell, actually go back to 1997.  The $3 million on February 18,

18    2004, was a transfer from the trust to the accounts of the

19    Guerins.

20            THE COURT:  When you say that was a transfer to the

21    accounts of the Guerins, the day before, on February 17,

22    $517,876.21 were transferred to Mr. Guerin's Bank One account.

23    That was another transfer to the Guerins.  And on October 1,

24    2003, just a few months earlier, a million dollars went

25    someplace, the government says unknown.  Those are rather high

1    living expenses.

2         MR. ROTERT:  Your Honor, the expenses associated with

3    this litigation, which essentially started to heat up in 2003,

4    have been pretty significant.  They were in any event having to

5    liquidate their assets.  They were taking a beating in the

6    economy at the time.  They weren't getting back the dollars

7    that they had invested in.

8         Judge, let me say this.  I don't think anyone

9    believes, and I hope the Court doesn't consider, that there are

10   any hidden assets or any assets that are not accounted for that

11   are still in the possession or control of the defendant.

12        THE COURT:  I get paid to be skeptical, Mr. Rotert.

13   That's the nature of the job of a district judge.  When I'm

14   presented with a case that involves fraud, I'm extra skeptical.

15        MR. ROTERT:  I appreciate that, your Honor.  One thing

16   I think the Court need not be skeptical about, and that is the

17   ability of the government team here, as assisted by their

18   agents, to follow the money.  I think it is a fairly safe

19   matter for the Court to take comfort in that if there were any

20   indication that this money was being squirreled away and kept

21   from the visibility of the Court, it would have been determined

22   by Ms. Mazzella and the other people working for the

23   government.

24        I appreciate that the Court thinks that there have

25   been significant expenditures, and I understand the Court's

D3lzgue09

1    concern, but I do want to say that there were a lot of moneys

2    that just were lost because of the economy and then had to be

3    spent on other matters, such as litigation costs and medical

4    costs and improvements and things that they were doing in their

5    residence.  This is the money that they used in those fashions.

6              I'm not in a position to itemize this money, Judge,

7    but it really is not a situation where Ms. Guerin is sitting on

8    a secret stash or, for that matter, Mr. Guerin.  And I know

9    that the government has carefully investigated their financial

10   situation.

11             THE COURT:  Anything further on the pre-sentence

12   report?

13             MR. ROTERT:  Not on the PSR, your Honor.

14             THE COURT:  Mr. Okula, does the government believe

15   that there are any matters that warrant modification or

16   correction in the pre-sentence report?

17             MR. OKULA:  We do not, your Honor.

18             THE COURT:  I have considered the parties' submissions

19   to me.  Mr. Rotert, do you wish to be heard on behalf of Ms.

20   Guerin?

21             MR. ROTERT:  May I please, your Honor?

22             THE COURT:  You may.

23             MR. ROTERT:  Your Honor, I would like to talk about

24   the two facets of a sentencing proceeding that are most

25   prominent in everyone's mind, and those relate to the financial

1     penalties and then to the sentence itself.  If the Court

2     please, I would like to do the financial side of it first.

3              THE COURT:  You may.

4              MR. ROTERT:  Your Honor, the United States on

5     Wednesday sent me a group of materials that they also presented

6     to the Court in which they urged that Ms. Guerin should be

7     subject to a restitutionary order in this case.  I don't know

8     if I have the exact last number, but I know that it is in the

9     realm of 180-plus million dollars.  Your Honor, I want to

10    address that because I think that that is an amount that, while

11    I don't challenge the arithmetic used to reach it, I think an

12    order of restitution in this case as to Ms. Guerin under the

13    circumstances is neither necessary nor appropriate.  I'll say

14    that for this reason.

15             THE COURT:  If I could interrupt for one second.

16             MR. ROTERT:  Yes.

17             THE COURT:  The latest information, as I understand

18    it, from the government is that the government asserts that

19    with interest, restitution in the amount of $190,355,836 is

20    due.  Is that the submission that you received?

21             MR. ROTERT:  Your Honor, Wednesday afternoon at 3:15

22    they sent me a group of materials that had the number

23    $189,276,000.

24             THE COURT:  Mr. Okula, which figure is correct?

25             MR. OKULA:  Your Honor, with the additional interest

D31guen9

1  computation that the Court asked for, the correct figure is

2  $190,355,836.  I think the previous submission was a million or

3  two less than that, but we updated the numbers to include the

4  additional interest that had accrued for the last period that

5  was covered, which ended December 31, 2012, and is current to

6  today.  So it is the $190 million figure, your Honor.

7           THE COURT:  Thank you.

8           MR. ROTERT:  The letters or the materials that they

9  filed with the Court a week ago today had the number at

10 92 million.  So it's gone up by a hundred million dollars over

11 the space of several days.

12          THE COURT:  The government tries to get it correct

13 when we finally get down to sentencing, I guess.

14          MR. ROTERT:  I'm not convinced that they have gotten

15 it correct, your Honor.  But the reality is there is I don't

16 think anyone in this room who believes that Ms. Guerin could

17 make restitution payments in anything close to that amount.

18          The primary concern I want to address to the Court is

19 this.  If anything is apparent from all of the submissions and

20 all of the information known to the Court, it is that this was

21 a case that involved an extremely large number of conspirators,

22 both indicted and unindicted.  It involved lawyers, it involved

23 bankers, it involved financial advisers and accountants.  It

24 involved taxpayers.  They are literally spread all over the

25 country.

1          The proposition that in this hearing this afternoon

2     the Court could reach a reliable determination about these

3     numbers, and especially these numbers that have been coming in

4     over the course of the last few days, I think is neither fair

5     to the Court nor consistent with what the statute calls upon us

6     to do.  I think it was for this reason, Judge, that Judge

7     Kaplan, at the conclusion of the KPMG case, made the

8     determination -- for the Court's benefit, if it is helpful, I

9     brought a copy of the order that Judge Kaplan issued in which

10    he determined that under the statute, as the restitution

11    statute expressly provides, it really wasn't possible, because

12    of the complication and prolongation of the sentencing process

13    that would be required, to fashion individual sentences of

14    restitution.

15         The same thing happened in the E&Y case, your Honor,

16    where multiple defendants were convicted on charges that,

17    although they involved different tax strategies, were in many

18    fundamental respects indistinguishable from the charges in this

19    case, and no restitution was ordered in that case either.  I

20    will indicate to the Court that in both KPMG and in the E&Y

21    case no forfeitures were sought.

22         I would submit to the Court that in a case such as

23    this, where Ms. Guerin has reached agreement with the

24    government about a forfeiture amount, an agreement reached

25    after the government was privy to her financial situation and

her financial statements, and where the defendant has made that

$1.6 million forfeiture payment today, adding an additional

restitutionary obligation, and particularly one with the

gargantuan numbers that the government has put before you, I

don't know that we can reach a reliable determination that

those numbers are correct.  And even if we reached it, then we

would have to make other determinations about the apportionment

of that liability.

So, your Honor, I am asking the Court to accept that

the plea agreement calls for the payment of $1.6 million, which

has been made, and that the Court not impose an additional

order of restitution on Ms. Guerin.

I don't usually like alternative arguments, Judge, but

I appreciate that in some circumstances they may be helpful to

the Court.  I would propose an alternative if the Court is of

the view that restitution needs to be ordered.  In that regard

I'm going to take advantage of one of the citations that the

government made to the Court with respect to this very issue.

When I said in my submission that there was too much

of a complication and too much of a detailed analysis required

to reach a restitutionary order, the Court said, well, another

member of the bench here in the Southern District concluded to

a different effect when it sentenced another person who was a

conspirator in this case, Mr. Kerekes.

I did take a look at the order that that district

D31gguec

 1    court entered.  I would note, first of all, that he indicated

 2    that there was no forfeiture in that case and a fine of -- I

 3    can't find it right here -- a $200 special assessment and a

 4    $50,000 fine.  So the economics of that case were somewhat

 5    different.

 6             The judge said in the course of reaching his

 7    determinations, he said, one of the reasons that I want to do

 8    this is because the defendant has ample resources to pay any

 9    restitutionary order.  I don't believe that to be the case with

10    Ms. Guerin.

11             What the judge did with respect to Mr. Kerekes

12    ultimately was a product of his note that allocating

13    restitution on a joint and several basis when there are

14    multiple defendants, some not even at the bar but others in

15    other courtrooms and all over the place, that the better part

16    of it is rather than make a restitutionary obligation a joint

17    and several liability, that what the Court could do under 18

18    U.S. Code section 3664(h) is that it could identify a

19    particular amount that should be paid by a particular defendant

20    as restitution.

21             Your Honor may recall that in the plea agreement

22    reached between the government and Ms. Guerin, the government

23    agreed to apply a policy that the Department of Justice uses in

24    which moneys paid in forfeiture can be applied toward

25    restitutionary obligations.  Of course, that is a particularly

D31zgueC

 1   appropriate approach to take here because whether we pay it as

 2   restitution or whether we pay it as forfeiture, it is

 3   essentially heading to the same place.

 4        So, your Honor, in light of the fact that that policy

 5   is invoked by the government, I would submit to the Court that

 6   if the Court determined that a restitutionary award was

 7   absolutely necessary and if the Court disagrees with me that it

 8   would be an undue complication and a prolongation of these

 9   proceedings -- and we do not wish to prolong these proceedings,

10   Judge -- I would submit that the appropriate thing is to make a

11   restitutionary award below the $1.6 million forfeiture amount

12   such that the restitution could be applied from the forfeiture

13   funds.  But I do ask the Court not to impose an additional

14   burden on Ms. Guerin for restitutionary payments in addition to

15   the forfeiture sum that she has paid.

16        THE COURT:  Before you turn to the balance of your

17   arguments, I'd like to hear from the government on the

18   restitution issue.  Thank you, Mr. Rotert.

19        MR. OKULA:  A few points, your Honor.  I think the

20   Court endeavored to determine whether counsel objected or

21   quarreled with the restitution amount because if there is an

22   issue regarding the reliability of the numbers, there are

23   alternatives that the Court has.  I understood counsel to say

24   at the outset that they were not questioning the amount, yet

25   Mr. Rotert got up here and used the word "unreliable" on a

1    number of occasions.  He can't have it both ways, your Honor.

2              The numbers were the product of an extensive analysis

3    that we did.  It is for a universe of taxpayers who evaded

4    audit and therefore there are losses that are due and owing to

5    the government as a result.  We had a team of revenue agents do

6    the precise calculations.  They calculated them conservatively,

7    and those are the numbers embodied.  So, your Honor, I don't

8    think there is a real, genuine dispute that the number we are

9    starting with is $190 million.

10             To be sure, this is a complicated case, but it does

11   not necessarily follow that because you have a complicated case

12   and a number of different steps that need to be taken in order

13   to figure out the restitution, that the Court has to

14   automatically conclude that it is too complex.  It is not too

15   complex.

16             Judge Baer didn't find it was too complex.  The same

17   methodology we employed in giving Judge Baer the numbers for

18   the BDO-J&G clients, which is sort of a subset of the losses

19   here, led Judge Baer to determine that there was a

20   conservative, fixed number.  I think the number he ultimately

21   arrived at was $60 million for those clients.  So, your Honor,

22   we are dealing with a definite number.

23             We do not contest the fact that the Court has the

24   ability to apportion, and apportion depending upon the

25   consideration of a number of factors:  The defendant's

D31zgueC

 1   financial picture, her role in the conspiracy, and the like.

 2   It is true there are many conspirators in this case, so the

 3   Court would be perfectly empowered to apportion.

 4        But, your Honor, at the end of the day the IRS is out

 5   almost $200 million based on the figures that we presented.  It

 6   is a figure and a loss suffered directly by the IRS as a result

 7   of the defendant's conduct.  It was foreseeable to her.  Many

 8   of those clients were the defendant's own clients.  If not, she

 9   understood that losses were going to stem from the conspiracy.

10        So, your Honor, there is nothing unfair in the Court

11   determining that there is an apportioned figure that would do

12   justice in this case notwithstanding the fact that there was a

13   forfeiture effected.

14        Remember, forfeiture and restitution are two different

15   things.  We have different mechanisms to obtain financial

16   penalties, but the restitution figure is the loss suffered by

17   the IRS, and there is no reason why the Court should not fix a

18   number that could be paid over time.

19        Thank you, Judge.

20        THE COURT:  Mr. Rotert, does the defendant contest any

21   of the loss calculations or interest calculations?

22        MR. ROTERT:  Your Honor, there certainly are things

23   about the loss calculations that seem to us out of line.  For

24   one thing, we believe that the tax rate applied was --

25        THE COURT:  Do you want a Fatico hearing?

D31 xguec

 1              MR. ROTERT:  No, Judge, I don't.  Your Honor, I don't

 2     want to prolong.  But I think that to say that the government

 3     is out this amount of money -- first of all, the way that some

 4     of the taxes were calculated, which I have not, frankly, had a

 5     chance to review in great depth since I got them Wednesday

 6     afternoon, doesn't seem right.  But I don't want to exalt form

 7     over substance, Judge.

 8              Here is the substance.  The substance is that fines

 9     and penalties have been imposed in hundreds of millions of

10     dollar amounts on Jenkens & Gilchrist and BDO and Deutsche Bank

11     and others.  The fact is that these are taxpayers whose tax

12     returns filed in the year 2000 were filed within a month of

13     Rule 2044 issuing from the IRS.  There are complexities with

14     regard to who the defendants are, to what the proportionate

15     role was as to the individuals that are listed here.

16              At the end of the day, Judge, imposing a

17     restitutionary obligation on top of the forfeiture -- and I

18     appreciate Mr. Okula is correct.  I understand there is a

19     difference between forfeiture and restitution.  The real

20     question is, is it a necessary thing?  Will it add to the

21     public fisc?  Will it remove a financial harm to the

22     government?

23              The fact is that this is a different case because all

24     of the money goes to the government, whether we label it

25     restitution or label it forfeiture or label it financial

D31xguea

1    penalty.  You heard the testimony at trial.  The taxpayers who

2    testified paid back taxes and penalties.  The process of

3    developing an economically reliable number of loss here when

4    you consider that all the money goes to the government is more

5    than we should have to bear or that the Court should have to

6    bear.

7         The question is not whether there are financial losses

8    associated with this or whether or not those losses have been

9    recouped in whole or in part.  The real question is, does the

10   Court consider that it's an unavoidable necessity to impose an

11   additional restitutionary obligation above and beyond the

12   forfeiture obligation?  I submit to the Court that it is not a

13   necessity, that the defendant has disgorged a significant

14   amount of money today.

15        If you measure that amount of money against everything

16   she has ever earned, I know what percentage you come up with.

17   But if you measure it against everything she has now, it has

18   been an extremely painful amount of money to come up with.  But

19   that's what she's done.  Adding another restitutionary

20   obligation won't improve the financial condition of the

21   country.  The process of figuring out where the country stands

22   with respect to the dollars in this case would take a much

23   better economist than me.

24        I don't want to prolong these proceedings, Judge.  I

25   want to take this as an approach that is based on the realities

1    of what this defendant is able to do.

2            MR. OKULA:  One or two quick points, your Honor.  Mr.

3    Rotert keeps slipping into an argument about unreliability,

4    whether it's just given the complexity or given the accuracy of

5    the numbers.  I heard him to say at the end of the day he is

6    not contesting the number.  That leaves your Honor, in this

7    context where the restitution statute is mandatory, to

8    determine do the discretionary factors that allow apportionment

9    apply to have your Honor fix a smaller figure?  Certainly your

10   Honor has that discretion.

11           But reliability is a separate issue from the factors

12   that your Honor should consider for apportionment.  Although

13   Mr. Rotert has flip-flopped on this, I think at the end of the

14   day he is not questioning reliability.  The numbers are what

15   the numbers are.  He mentioned people who settled with the IRS.

16   That has nothing to do with this $190 million figure.

17           Yes billions of dollars were paid back by the tax

18   shelter clients who decided to settle.  These were clients who

19   rolled the dice and said I'm going to wait to see if the IRS

20   catches me or comes after me.  To date, your Honor, they stand

21   there with their tax money as a result of the fraudulent

22   shelters that the defendant sold.

23           There is no dispute that the IRS is out that money.

24   The issue is the discretionary factors under apportionment, and

25   that's it, your Honor.

1            THE COURT:  Mr. Rotert, one last time for the record,

2     do you contest any of the loss calculations or the interest

3     calculations, the total number?  I understand your other

4     argument.  The question is, do you contest the total number of

5     $190,355,836?  Please try to answer that question yes or no.

6            MR. ROTERT:  No, your Honor.

7            THE COURT:  Very well.

8            I am going to rule on the restitution issue right now.

9     Then we can proceed to the other aspects of sentencing.

10           The Mandatory Victim Restitution Act requires the

11    imposition of restitution equal to the amount of actual loss

12    suffered by the victim, here the Internal Revenue Service.  See

13    United States v. Carboni, 204 F.3d 39, 47 (2d Cir. 2000).  The

14    amount of loss is calculated as of the date of sentencing and

15    includes prejudgment interest.  See United States v. Quarashi,

16    634 F.3d 699, 703-04 (2d Cir. 2011).

17           Pursuant to Title 26 of the United States Code section

18    6621 and 6622, the interest is compounded daily at a quarterly

19    determined rate equal to the federal short-term rate plus 3

20    percent.  The parties agree that the restitution calculation

21    submitted by the government is mathematically correct.  This

22    Court adopts those calculations as its own, and accordingly the

23    total amount of restitution, including prejudgment interest, is

24    $190,355,836.  This Court may "make each defendant liable for

25    payment of the full amount of restitution or may apportion

D31zgueg

 1    liability among the defendants." 18 U.S.C. section 3664(h).

 2         Ms. Guerin, in this Court's view, played a central and

 3    longstanding role in the conspiracy, and the order of

 4    restitution should reflect her culpability.  Accordingly, this

 5    Court holds that Ms. Guerin is responsible jointly and

 6    severally with others for the full amount of restitution in the

 7    amount of $190,355,836.  I will include that in the judgment of

 8    conviction in this case.

 9         Mr. Rotert, I'm prepared to hear your arguments on

10    behalf of Ms. Guerin.

11         MR. OKULA:  Your Honor, before you do that, may I add

12    one thing that should be included in the judgment as well?

13    Judge Baer did this, and I think it is a matter of fairness to

14    the defendant.  To the extent that there are future proceedings

15    against those people who escaped audit, because there is an

16    argument available to the IRS that because fraud was committed,

17    the statute of limitations is open, there could well be

18    proceedings against those taxpayers in the future.  So the

19    defendant, to the extent that the IRS makes collections in the

20    future, would be given credit for reduction of her amount for

21    those collected amounts and will endeavor to essentially

22    coordinate with the IRS to make sure that that the math is

23    done.

24         THE COURT:  I'll include that.

25         MR. ROTERT:  Your Honor, may I ask that pursuant to

1    section 3664(f)(3)(B), which reads, "A restitution order may

2    direct the defendant to make nominal periodic payments if the

3    Court finds from the facts on the record that the economic

4    circumstances of the defendant not allow the payment of any

5    amount of restitution order and did not allow for the payment

6    of the full amount of the restitution order in the foreseeable

7    future under any reasonable schedule of payments" -- your

8    Honor, I can't believe that the Court thinks that Ms. Guerin is

9    able to make payment of $190 million.

10             THE COURT:  I am going to put Ms. Guerin on an

11   installment payment schedule at the end of the day based on her

12   income.

13             MR. ROTERT:  May I proceed, your Honor?

14             THE COURT:  You may.

15             MR. ROTERT:  Your Honor, the Court and the parties are

16   all familiar with the language of the provisions of the statute

17   and the Booker debates in the post-Booker world.  Judge, I

18   appreciate that there are two prongs that the Court has to keep

19   in mind.  First, it has to find a sentence that is sufficient.

20   Second, it has to fashion a sentence that is sufficient but not

21   greater than necessary.

22             The government asks the Court to impose the maximum

23   sentence permitted by the law on Ms. Guerin.  I certainly can't

24   argue the sufficiency prong in the sense that if Congress said

25   that the most you can give to someone for an offense is 5

1   years, that must by definition be sufficient, in fact, it must

2   be at the outer edge of sufficiency in the minds of Congress.

3   So I appreciate that the government has asked for that sentence

4   from the Court.

5          The Court knows that I am going to ask the Court to do

6   something significantly different.  I ask that because I think

7   that as a matter of faithful application of the standards set

8   forth in 3553(a), it is appropriate to sentence the defendant

9   far below the stipulated guideline range or, as I prefer to

10  call it, the absolute maximum permitted under the law.

11         Your Honor, I know that the Court holds opinions and

12  views like any person would, and especially a professional,

13  about the facts of this case.  I know that this case brought to

14  the Court a parade of very wealthy people, very ambitious

15  people, in many instances very greedy people.

16         I know that money and amounts that are frankly well

17  beyond the ken of most of us were thrown around the courtroom

18  as if they were everyday amounts.  And I'm sure that as the

19  Court looked over the professionals -- the lawyers and the CPAs

20  and the tax accountants, the bankers -- who engaged in this

21  conspiracy, I'm sure that the Court found that to be extremely

22  distressing and personally distressing.

23         People who try to practice their profession with

24  integrity take it hard if they see others not following in that

25  lead, so I know that subjectively the impulse for the Court is

D31zgua5

1    to be harsh, to be stern, to punish.

2            Judge, I suspect that when the Court was confronted

3    with the problems that are familiar to us all with respect to

4    Juror 1 -- the Court had worked so hard, it had read so much,

5    it had put itself through so many extra burdens to be ready for

6    that trial, and then the Court provided an outstanding and fair

7    trial, did everything within its powers and beyond the powers

8    of many to assure a fair trial -- nevertheless, circumstances

9    that none of us could control brought the Court to a very

10   painful place.  The Court had to decide whether or not to

11   follow its own impulses, its own wishes.  I can't imagine that

12   the Court wishes anything more than not to have to go through

13   that trial again.

14           Weighed against that, the Court had to decide what

15   justice required, what the law counseled, what its conscience

16   directed.  I hope the Court will forgive me for making the

17   observation that it was a singular act of courage for the Court

18   to do something that it did not prefer to do because the Court,

19   compelled by the law, felt that it had to do it.

20           I call upon the Court today because of my belief that

21   an analogous situation now obtains.  I'm sure that there is a

22   part of the Court that would find it rewarding to impose the

23   maximum sentence, that would find it a culmination of a lot of

24   frustrations to say this person should go away for a decade.

25   But, Judge, I believe, because I have seen in my own

1    experience, that the Court will look past those feelings and

2    past those issues and look to what the statute counsels.

3         What are the nature and characteristics of Donna

4    Guerin?  Judge, I was very struck by the writing in the

5    pre-sentence report which I attribute to a government author

6    that Donna Guerin was a junior partner at Jenkens & Gilchrist.

7    She was a partner, or a shareholder as they call them.

8         She definitely was a person with sufficient training

9    and intellect to have made the hard choice not to follow along

10   with the groundswell of people that were heading into this tax

11   shelter business.  Nevertheless, I believe that on this

12   evidence and on this record, including everything said in the

13   government's submission, she didn't design these tax shelters,

14   she didn't market these tax shelters.

15        I was noting that the government said that one good

16   example of what went on in this case related to a client named

17   John Martin.  The evidence at trial showed that John Martin

18   first came to Ms. Guerin's attention when John Martin's

19   financial adviser and banker sent her an email saying that Mr.

20   Martin wanted to do a tax shelter deal.

21        She implemented it.  She did the paperwork.  She

22   worked on the opinion letters.  There is no question that that

23   is true, because she stood before you on September 13th and

24   admitted to her guilt.  And I don't think anyone is challenging

25   that she has acknowledged her guilt and has accepted her

1 | responsibility.

2 |     But, Judge, as upsetting as it may have been, as it is

3 | today, to look over that panoply of people and firms who were

4 | involved in this industry, I can't change the fact that these

5 | things took place.  But neither can the government change the

6 | role that Ms. Guerin played in those events.

7 |     Judge, it is easy and I might say predictable for the

8 | government to say, you know, Mr. Rotert's argument really boils

9 | down to one of those "everybody does it" kinds of an approach.

10 | I reject that, Judge.  The reason I do is that that is a facile

11 | and easy way to label an argument that actually is historically

12 | correct.

13 |     I don't care about crack dealers selling on the

14 | streets as an analogy.  I think it is a false analogy.  I think

15 | what we saw here was one of the most remarkable, if not

16 | distressing, episodes of my professional career.  You had

17 | institutions and individuals who decided collectively,

18 | repeatedly, and over a period of years to push the edge of that

19 | tax envelope as far as they possibly could and then try to push

20 | it further.  Is Ms. Guerin to be punished for what she did?  Of

21 | course.  Is Ms. Guerin the kind of person without whom this

22 | never would have happened?  Not even close.

23 |     Judge, I don't know if you saw it, but when I sent a

24 | letter to Ms. Jones, the probation officer, I included a

25 | memorandum that issued out of Jenkens & Gilchrist.  If the

1    Court hasn't seen it, I hope the Court will indulge me to read

2    just one paragraph from this memorandum.

3          Your Honor, this was a memorandum that came from the

4    executive committee at Jenkens & Gilchrist at the end of 2000.

5    It was sent to all of the lawyers, or at least all of the

6    shareholders, at the time that compensation and bonus decisions

7    were being made.  So this was not just a lawyer at Jenkens,

8    this was the structural ownership of Jenkens.

9          THE COURT:  What is the date of this?

10          MR. ROTERT:  Your Honor, this is dated December 29,

11    2000.  This is directed all shareholders from the board of

12    directors.  I'll happily hand this up to the Court.

13          THE COURT:  It's not necessary.  I just wanted to know

14    the context.

15          MR. ROTERT:  This is the context, Judge, just at about

16    the time that the short options strategy is coming into

17    currency.

18          After two paragraphs talking about revenue and

19    productivity and things that law firms like to put in, the

20    following paragraph appears.  It was sent to all of the lawyers

21    at Jenkens & Gilchrist.  It reads:

22          "Special appreciation, of course, to the singularly

23    spectacular contributions of Paul Daugerdas and Erwin Mayer to

24    our 2000 results, supported principally throughout the year

25    with the invaluable efforts of Donna Guerin, Bryan Lee, and

D31zgueo

1  Mike Cook."

2          These lawyers, these directors of the firm, could not

3  gush enough about the wonderful things that were being done by

4  Mr. Daugerdas and Mr. Mayer as supported by Ms. Guerin.  The

5  other two lawyers named as the supporters of Mr. Daugerdas and

6  Mr. Mayer, one of them was Mike Cook, about whom I wrote in my

7  submission, who was the chairman of the tax department, who

8  signed innumerable opinion approval forms, who participated in

9  the development of opinion letters on an annual basis.

10          Another one of those lawyers was Bryan Lee, a young

11  man who also was very intellectually gifted and very talented

12  and who engaged in these tax shelter practices, along with

13  Patrick O'Daniel, a former Supreme Court clerk, and along with

14  Andreas Kontrimus, a Houston-based partner who had the fortune

15  to bring Michael Hammer into a HOMER deal.

16          I need to help, if I can, place Donna into the context

17  and the situation and the milieu of her times.  She wasn't

18  leading the tax practice, but she was being swept along on this

19  current of enthusiasm that was surrounding it.  She was

20  lionized.  She was made a hero, made to feel like a wonderful

21  person by the shareholders, including shareholders whose

22  primary area of practice was taxation.

23          And they were competitive, because they weren't the

24  only firm that was doing this kind of thing.  Other firms in

25  Texas, firms that we could see their buildings looking out the

D31zguen

 1    window of this courtroom, were also involved in this

 2    enterprise.  KPMG was involved in this.  Ernst & Young was

 3    involved in this.  Deloitte was involved in this.  Deutsche

 4    Bank was involved in this.  Banks all over the place were

 5    involved in this.  Bank One.

 6          Does that mean that what she did isn't wrong?  Heavens

 7    no.  She came in and pled guilty, Judge.  Does that mean that

 8    she took a leading role, that these were her ideas?  There is

 9    no proof of that.  Did she implement these things?  Did she do

10    the paperwork?  She did.  She did.  We don't dispute that.

11          Judge, when we talk about what is sufficient but not

12    greater than necessary, we have to balance that not only

13    against the conduct of others but against the life of this

14    person.  I don't know how the Court feels about letters.  I

15    know that in some instances they can be burdensome.  I hope, I

16    pray, that in this case they were illuminating.

17          Judge, it is an irony of my life that nine years ago

18    today I was introduced to Donna Guerin for the first time.  I

19    don't mean to offend the Court, but I must tell you that in

20    that period of time I have never seen a venal or a selfish or a

21    hostile word or thought come out of her.  In that period of

22    time I have seen her show compassion and generosity.  I have

23    seen her show love and sorrow.  The day that the verdict came

24    down in this case, if people saw us walking together, I'm not

25    sure that they would have been able to divine which of us had

 1    actually just gotten that verdict.

 2         The dignity, the faith, the approach to how you deal

 3    with other people in this person is worth saving.  It is worth

 4    taking into account.  It is an important part of the

 5    characteristics of this person.

 6         Your Honor, I want you to, if you will bear with me,

 7    let me talk a little bit about the other sentences in the other

 8    cases.  Mr. Okula has been nice enough to give us a chart that

 9    contains all sorts of results in all sorts of other cases.  We

10    have all been around this system long enough, Judge, to know

11    about the debates on consistency in sentencing or disparity in

12    sentencing.  But I must tell you, Judge, I don't know that I

13    have ever seen a case that is quite like this.

14         Here we don't just have all of those people that have

15    committed tax fraud, because tax fraud began roughly the time

16    the Internal Revenue Code was implemented, and I dare say that

17    it is going to continue through our lives.  I'd like to be more

18    optimistic about it, your Honor, but to the extent that the

19    Court is skeptical, I have a bit of that myself.

20         Your Honor, the point is that in one particular

21    instance we had this phenomenon, this tax shelter marketplace,

22    and the government, for reasons that are legitimate, isolated

23    this cell at KPMG, and they isolated this cell at Ernst &

24    Young, and they isolated this cell at Jenkens, but in a very

25    functional and logical way, those are all part of the same

D3lrgue9

1     case.  They were all doing the same thing.

2          They were all coming up with these theories, these

3     labyrinthine ideas about how to get just to the edge of that

4     tax envelope and maybe just a little bit further, and they were

5     all turning a blind eye to the realities of what the clients

6     were doing.

7          If Ms. Guerin is to be convicted, as she is, so must

8     many others, as they have been.  And if Ms. Guerin is to be

9     punished, as she will be, it is only just that she be evaluated

10    for punishment against the backdrop of what happened in those

11    other cases.

12         This isn't just a matter of the dollar amount here was

13    this and so therefore we find a dollar amount that is similar.

14    This is a very specific and unique chapter of history.  It is a

15    very particular and individualized course of conduct in which

16    many engaged.

17         There is a man out of Chicago named John Ohle who

18    marketed HOMER tax shelters.  His clients were some of the

19    people that enjoyed the stay with us in New York during the

20    trial.  Mr. Ohle not only engaged in all of the conduct in

21    which Ms. Guerin engaged, only more, he also lied to his own

22    employers and stole money from people that trusted him.  Mr.

23    Ohle was a difficult individual.  In this building he was

24    convicted on felony charges because of that behavior.

25         The trial prosecutor, of course, was my colleague, a

1    man whom I respect, Mr. Okula.  Mr. Okula, for reasons I fully

2    understand, suggested that Mr. Ohle should receive the maximum

3    sentence.  But he didn't.  He got 60 months.  He got 60 months.

4    I can't look into the mind of the judge who sentenced him

5    except to know that that judge put 3553(a) down in front of him

6    and made a determination to the best of his ability.

7           Judge, I cannot believe that my colleague Mr. Okula

8    would argue to you that Ms. Guerin is qualitatively or

9    quantitatively a worse person than Mr. Ohle.  The people in the

10   Ernst & Young cases were lawyers.  The people in the KPMG case

11   were lawyers.  Mr. Ohle was a lawyer.  The circumstances that

12   may give the Court cause to be upset with Ms. Guerin's conduct

13   were also present in those other cases.

14          I submit to the Court that as a matter of statutory

15   mandate, but even more importantly as a matter of the Court's

16   own notions of fairness and conscience, we must not say through

17   a sentence that Ms. Guerin should be susceptible to more

18   punishment than those people in those other cases whose

19   conduct, if distinguishable, is distinguishable only because it

20   was worse.

21          Every defendant who comes to the court is sorry to be

22   there for sentencing.  All sentences are solemn and unhappy

23   events.  But, Judge, in this case and for this woman, this

24   entire series of events, now at least nine years in the making,

25   have absolutely ruined her life.

D31zgueG

 1                 The most important things that I am taught a person

 2      can have in their heart are faith, hope, and charity.  I know

 3      from Donna that she still has faith, and I know from her

 4      conduct that she still has charity, but I'm anxious about the

 5      hope piece, Judge.  I implore the Court to fashion a sentence

 6      that doesn't extinguish that hope, that gives her some hope,

 7      some opportunity that there can be another chapter in her life,

 8      a good chapter that brings out the best of what she has to

 9      offer.

10                 Your Honor, sufficient is the easy part of your job

11      today.  The not greater than necessary part is difficult.  But

12      I do encourage the Court, I do advocate to the Court, I do

13      implore the Court that it is not necessary to send Donna Guerin

14      away for as long as the government asks, that it is not going

15      to make this country safer, it is not going to make taxes get

16      paid more faithfully.  The deterrence of what happened here has

17      been writ large before we ever came to town today.

18                 The sentencing standards that you have to apply under

19      the statute, in my judgment and I hope in the Court's, all

20      point to a sentence that balances just punishment with

21      compassion and an appreciation that this is not a bad person.

22      This is a woman, a fundamentally good and decent person, who

23      got put into and allowed herself to get swept along by those

24      who were praised for their spectacular contributions.

25                 I know about the moral compass.  But when you are

D31zrue9

1    standing there and everybody around you is insisting to you

2    that south is north, it's a little harder.  She made mistakes.

3    She's going to pay for those mistakes.  We have already had a

4    restitutionary order imposed that is going to follow her now

5    for the rest of her life.  I hope that the Court will find it

6    possible and just to give her as much of that life as it can.

7              Thank you, Judge.

8              THE COURT:  Thank you, Mr. Rotert.

9              Mr. Okula, does the government wish to be heard?

10             MR. OKULA:  Briefly, your Honor.

11             I used the word "briefly, your Honor, because we are

12   in the unusual setting of the Court having presided over a

13   lengthy trial that involved witnesses and documents that

14   demonstrated a truly unprecedented fraud.  Judge, we have used

15   a number of adjectives that have described this case and the

16   losses that stemmed from it as unprecedented or gargantuan.

17   This is truly the case that involves the largest attempted loss

18   and actual losses suffered by the IRS in a criminal tax

19   setting:  $7 billion of fraudulent tax losses or benefits, $1.5

20   billion of guidelines loss, and hundreds of millions of dollars

21   of actual loss.

22             Having been involved in this case and used those

23   numbers for quite a while, it's sometimes easy to forget that

24   the additional zeros that are involved in this case, your

25   Honor, the mammoth loss that was involved through sustained

 1    activity over years and years and years has got to be a factor

 2    that the Court considers when fashioning sentence.

 3         Numbers take us only so far, I recognize that, your

 4    Honor.  But it is not without significance that the tax loss in

 5    this case is four times greater than the maximum amount even

 6    covered by the tax table.  The tax table maxes out at

 7    $400 million.  Everything above that is given the same amount.

 8    Shouldn't it be significant that the loss is four times greater

 9    than the maximum?  I think unquestionably the answer to that is

10    yes.

11         It is also important, your Honor, and I want to focus

12    in on a couple of specific facts I think that speak volumes

13    about Ms. Guerin's conduct in this case.  Mr. Rotert used some

14    very interesting phrases, like "culture of enthusiasm" about

15    the tax shelters.  It was really a culture of corruption, a

16    culture of corruption that many people, your Honor, who were

17    introduced to these things stood up and said no, not me.  But

18    that didn't involve Donna Guerin.  She was swept up on it and

19    she knowingly engaged in it.

20         Another fact or another set of phrases Mr. Rotert used

21    was going right up to the line and deciding to edge over that

22    line.  Well, Judge, she didn't just edge over the line with

23    respect to the backdating of the transactions.  That is

24    accountancy and law 101.  You cannot backdate transactions to

25    change those transactions after the year end.  Ms. Guerin

1  engaged in that a number of times.

2          What that means, your Honor, is that unlike what Mr.

3  Rotert was suggesting, where it was swept up and people who

4  were just easing over the line and engaging in criminal

5  activity, there was a species or subset of activity that was so

6  flagrantly and so knowingly wrong that any first-year law

7  student would know it, and she engaged in that.

8          One thing remarkable about that is the ease and the

9  matter of factness with which it was carried out.  Your Honor

10  saw the evidence.  Ms. Guerin faxes over to David Parse that

11  little note where David Parse's secretary said, here's what I

12  sent in order to effectuate the losses that the taxpayer wants

13  and here's what should have been sent, suggesting to them in

14  January of that year change it and we'll backdate the

15  transactions.

16          They didn't even have to use code words or hide words.

17  It was just a matter of fact about how they were going about

18  it.  I think that warrants consideration, your Honor, and the

19  fact that this is something wholly different from the sort of

20  pushing the envelope type of crime that Mr. Rotert was

21  suggesting.

22          One additional thing I want to focus on, your Honor,

23  and I think the Court might recall this because no matter how

24  long the case is, it has a couple of small nuggets with respect

25  to each defendant that remains so vivid and that is so telling

1   and that suggests so much about the culpability of the person

2   that it warrants mention.

3            The one that I want to point out is the meeting in

4   early 2000 that Erwin Mayer testified about.  It is subject to

5   certain notes that were taken by a junior J&G associate.  It

6   occurred in Chicago when Ms. Guerin and Mr. Mayer had called up

7   a number of Texas-based J&G associates to get a tutorial from

8   Donna Guerin about how these tax shelters worked and how they

9   were going to prepare the tax returns.

10           There was the one note that was encaptured in the

11  note-taking of one of those associates that captured what Ms.

12  Guerin said during that meeting.  When describing why they

13  inserted the limited liability company, the LLC, into the short

14  sale and short option tax shelter, she said, and it is a

15  virtual quote, it was part of the hide-the-ball strategy of

16  this tax shelter.  Imagine that.  She's talking in a matter-of-

17  fact way to a group of junior associates that it's part of a

18  hide-the-ball strategy with respect to hiding the ball from the

19  IRS, not to give it transparency so it will be audited.

20           What is occurring at that meeting?  There are junior

21  associates at Jenkens & Gilchrist who are being tutored by Ms.

22  Guerin about this criminal activity.  That is precisely why she

23  was given a supervisory role in this, your Honor.  So it is

24  important to keep in mind that, yes, we are not saying she is

25  Paul Daugerdas, Paul Daugerdas was the mastermind, the

```
 1    architect of the fraudulent strategies that led to most of

 2    these shelters, she is not Paul Daugerdas, but she was a leader

 3    who dragged other people in and supervised those junior people

 4    and was responsible for some of those junior people also losing

 5    their moral compasses and engaging in criminal activity, people

 6    like Bryan Lee and Patrick O'Daniel and the other junior

 7    associates at the firm.  It is important, your Honor, to keep

 8    that in mind.

 9          The main point I want to make before I sit down, your

10    Honor, is we can't quarrel with Mr. Rotert's argument that it

11    is unlikely from a specific deterrence standpoint that you are

12    going to see Donna Guerin in a courtroom again.  But, your

13    Honor, the sentence that you impose in this case is so vitally

14    important, and I can't stress it enough, from a general

15    deterrence standpoint that a meaningful sentence is, in a word,

16    essential.

17          Since I'm a little bit of a dinosaur in the U.S.

18    Attorney's office and spend most of my time doing criminal tax

19    cases, I like to think about tax policy and the similar issues,

20    and I have.  In comparing the relative tax compliance in the

21    United States with other countries, what makes I think it

22    remarkable about the United States is that we do have a

23    relative high degree of tax compliance.  There are many

24    European countries, South American countries where tax evasion

25    is really a sport that so many more engage in.
```

D31Rguno

                    In order, your Honor, to convey the message to people,

and I think it is a reason why we have a generally high tax

compliance here, is that there has to be the real understanding

that there are serious consequences and not slaps on the wrist

for engaging in criminal activity.  When you have systemic,

years-long, leadership-driven criminal activity that causes

unprecedented, truly unprecedented amounts of loss to the IRS,

the message has to be sent that there are serious consequences.

                    Your Honor, I go before judges in this court all the

time.  There are cases when we go into the sentencing and we do

not quarrel with the fact that a below-guidelines sentence

might be appropriate given the factors.  And there are cases,

your Honor, of which this is one, where it is essential to

figuratively pound on the table to say that an important

message needs to be sent.

                    The losses that are involved in this case are well

known.  The repercussions for somebody who knowingly and

systemically got involved in the conduct and enjoyed the

multimillion-dollar benefits from that conduct, the sentence

stemming from that activity has to be well known and it has to

be an important one for deterrence purposes.

                    Thank you, your Honor.

                    THE COURT:  Before you sit down, Mr. Okula, would you

respond to Mr. Rotert's argument concerning Mr. Ohle.

                    MR. OKULA:  I would be happy to, your Honor.  I give

1   credit to my co-counsel, who actually wrote me a note to make

2   sure to speak about that, and of course I dropped the ball and

3   did not.  But I would be happy to answer that, your Honor.

4          Comparisons are important, and I think that there are

5   several significant differences between Mr. Ohle's case and Ms.

6   Guerin's.  The tax loss involved from Ohle's conduct was

7   $110 million.  The loss involved from Donna Guerin's conduct,

8   which spanned four fraudulent tax shelters -- Mr. Ohle's

9   involved one, actually two.  Principally, there was a

10  $110 million or so from the fraudulent HOMER tax shelter, which

11  was part of our case.

12         Mr. Ohle also involved himself and two close friends

13  in a different tax shelter with respect to their personal

14  activities.  He didn't really sell it.  It wasn't part of the

15  loss that was involved significantly in his sentence.

16  Essentially, his sentence was based on one shelter plus the

17  personal use of another.  That's one important difference.

18         The time period between Mr. Ohle and Ms. Guerin is

19  significantly different.  Mr. Ohle's activity was about 2 years

20  in duration and involved, like I said, principally the one

21  shelter.  Ms. Guerin's activity involved 6, 7, 8 years worth of

22  activities and the 4 separate shelters.

23         Yes, I concede readily that the tax shelter fraud as

24  well as Mr. Ohle's defrauding of his employer Bank One was

25  involved.  But I suggest to you, your Honor, the loss for the

1    Bank One activities was fully captured in the overall tax loss.

2          The bottom line is, your Honor, there is a significant

3    difference in the duration of the criminal activity and the

4    amount of the tax loss that was involved.  Mr. Ohle was

5    convicted of three counts.  His guidelines at the end of the

6    day, because of various leadership adjustments and the like,

7    were 360 months to life.

8          Judge Rakoff, notwithstanding the fact that we argued

9    that a 15-year sentence, or less than half the applicable

10   guidelines, was appropriate, decided that 60 months was the

11   appropriate sentence.  We think he was wrong.  We respectfully

12   take issue with the approach that Judge Rakoff took.  But that

13   was the sentence that he imposed.

14          Are there any other questions, your Honor?

15          THE COURT:  No.  Thank you, Mr. Okula.

16          Mr. Rotert, does your client wish to address the Court

17   before sentence is imposed?

18          MR. ROTERT:  She does, your Honor.

19          THE COURT:  I'll hear from Ms. Guerin at this time.

20          THE DEFENDANT:  May I remain seated, your Honor?

21          THE COURT:  Yes.  Pull the microphone over to you.

22          THE DEFENDANT:  Thank you.

23          I'm here awaiting your sentence as a defeated person

24   in many ways.  I worked extremely hard to get through college

25   and law school and to achieve success at a law firm.  Despite

 1   those years of study and sacrifice, I never wanted to

 2   necessarily be a famous attorney, certainly not an infamous

 3   one.  In any event, my legal career is gone and has been gone

 4   for a long time now.

 5        Besides wanting to be a lawyer, my other main dream in

 6   life was to be a mother.  Unfortunately, I wasn't able to

 7   physically bear children, and my hope to adopt is also now

 8   gone, along with my husband's hope to be a father and my

 9   mother's hope to be a grandmother.  The pain of that

10   realization is nearly indescribable and makes any other

11   sentence this Court finds appropriate pale in comparison.

12        Further, my actions have resulted in the loss of the

13   house my husband and I had made our home from the time that we

14   were married and into which we, and especially my husband, had

15   put so much work.  Quite frankly, I am at a point where there

16   is simply not joy in anything.

17        I regret and am truly sorry for my actions which have

18   brought me to this point.  In particular, I regret my reliance

19   on so many other accountants, attorneys, and financial advisers

20   whom I had depended upon to describe to our mutual clients

21   requirements I believed necessary for the tax strategies at

22   issue to pass muster.  I regret not taking time and effort with

23   those clients to further verify their intents.  I also regret

24   not having the clients with whom I did have such conversations

25   acknowledge them in writing.

1          I regret not further challenging certain positions

2     taken by my colleagues, including attorneys who were my

3     superiors, as well as others with whom I worked closely and

4     trusted but who apparently failed to be truthful with me for

5     many years.

6          I regret not better handling or further documenting

7     the circumstances surrounding my January 2001 submission to

8     Deutsche Bank of a document which changed the recipients of

9     assets in a partnership liquidation after the incorrect

10    document had been submitted the prior December, especially

11    considering that that revision actually decreased the potential

12    tax benefits for two of the three individuals who participated

13    in that transaction.  I do maintain that that was the only one

14    of the so-called backdating transactions that I had anything to

15    do with.

16         I am sincerely grateful for the support of my family

17    and my friends over the past decade, since the beginning of the

18    investigation into Jenkens & Gilchrist's tax practice, and for

19    those persons' belief in me.  I am sorry for disappointing any

20    or all of them, and particularly for whatever pain I have

21    caused to my husband and to my mother.

22         I continue to pray for God's forgiveness and his

23    strength to see me through this ordeal.  I beg you, Judge

24    Pauley, for your mercy and compassion in rendering the sentence

25    you are about to render.  Thank you.

D31guesa                                                                47

1            THE COURT:  The defendant, Donna M. Guerin, comes

2    before this Court having pled guilty to two serious crimes

3    against the United States, conspiracy to defraud the United

4    States, commit tax evasion, and engage in wire fraud, and one

5    substantive count of tax evasion.  Her plea followed a very

6    lengthy trial before this Court with which all the parties are

7    familiar.

8            This Court has reviewed the pre-sentence investigation

9    report and as amended on the record here today.  I adopt the

10   findings of fact in the report as my own.

11           Turning to the guidelines calculation, because the

12   loss amount here was more than $400 million, the base offense

13   level is 38.  Because the defendant, Ms. Guerin, was engaged in

14   encouraging co-conspirators to violate the tax laws, a further

15   2-level enhancement is warranted under 2T1.9(b)(2).

16           A further adjustment of 3 levels is warranted for Ms.

17   Guerin's role in the offense in supervising associate attorneys

18   at the Jenkens & Gilchrist law firm and providing tutorials.

19   As such, she was a manager and supervisor of activity involving

20   5 or more persons.  So her adjusted offense level is 43.

21           Back on September 13th Ms. Guerin pled guilty before

22   this Court.  She at that time accepted responsibility for her

23   criminal conduct.  Accordingly, I grant her a 3-level

24   reduction.  So, her total offense level is 40.

25           The defendant's criminal history category is a I.

1   That would yield a guideline range of 292 to 365 months.  But

2   each of the crimes to which Ms. Guerin pled guilty has a

3   maximum term of 5 years on each count.

4            As this Court noted in its decision granting a new

5   trial, the sanctity of an oath is central to the sound

6   administration of justice.  We are a nation of laws, and

7   lawyers are entrusted with great responsibility to ensure that

8   the laws are faithfully discharged.  When an attorney violates

9   her oath to uphold the law, she undermines our entire system of

10  justice.

11           This tax shelter fraud conspiracy was breathtaking in

12  its scope and in the damage it caused the nation, nearly $8

13  billion in fraudulent tax benefit claims and more than $1.5

14  billion in lost tax revenue to the United States.  It corrupted

15  numerous professionals, including attorneys, accountants, and

16  financial advisers.  It involved some of our largest financial

17  accounting and legal firms, including Deutsch Bank, BDO

18  Seidman, and Jenkens & Gilchrist.

19           Because of the complexity of the scheme, its success

20  relied on the unethical and criminal behavior of highly

21  educated, highly compensated professionals, like Ms. Guerin.

22  Lawyers and accountants became willing tools for the ultra-

23  wealthy to avoid paying their fair share of taxes, and these

24  professionals flagrantly violated their oaths in order to line

25  their pockets.

1              In the end, this case is all about greed.  Ms. Guerin

2    played a central role in the conspiracy.  She was not a

3    mindless automaton who unthinkingly committed crimes on

4    Daugerdas's behalf, nor did she commit these crimes because of

5    any cult of personality.  She became a criminal for two

6    reasons:  The lure of money and the belief that she'd never be

7    brought to justice.  She accumulated more than $18 million in

8    the process.

9              Navigating clients lawfully through her area of

10   expertise, the tax code, she facilitated their breach of the

11   laws.  For example, Ms. Guerin sold John Martin a tax shelter

12   transaction so he could avoid paying taxes on gains he received

13   from selling his computer software company.  Although he was

14   sold one tax shelter, he actually entered into a different tax

15   shelter, and then Ms. Guerin issued him an opinion letter and

16   other paperwork falsely describing Martin's knowledge of the

17   transaction.  Martin did not participate in the government's

18   amnesty program, instead choosing to play the odds that he

19   could file fraudulent returns and escape audit.  But the

20   government did audit him, and in court's view he was lucky not

21   to be indicted.

22             Ms. Guerin was also instrumental in backdating

23   transactions, which required her to violate her fundamental

24   obligations as a tax lawyer and a CPA.  Sadly, she trained

25   other, younger attorneys who may have looked up to her as a

D31zguec                                                                    50

 1   role model to follow in her footsteps and participate in a vast

 2   fraudulent scheme, including showing them how to "hide the

 3   ball" through the creation of LLCs.

 4          Ms. Guerin argues that this investigation and

 5   prosecution have exacted a considerable toll on her:  The loss

 6   of her law license, her reputation, and her home.  That is

 7   certainly true.  But she more than anyone knew the risks.  She

 8   knew that when she committed these crimes.  She knew her law

 9   license could be revoked.  She knew that her reputation would

10   be ruined and she could risk losing all her ill-gotten gains.

11   Back in the heady days when she was collecting millions of

12   dollars through this scheme, she funded a trust in her

13   husband's name, undoubtedly as a hedge against the possibility

14   that the government might someday bring her to the bar of

15   justice.

16          Ms. Guerin complains about the costs associated with

17   defending against this indictment.  She states that she was

18   required to engage counsel early in 2004, when the Department

19   of Justice first began investigating the tax shelter

20   marketplace, and she's paid significant legal fees for nearly a

21   decade, including the very costly process of defending a

22   lengthy criminal case far from home.  That's a quote from her

23   memorandum.

24          She laments the fact that she had to sell her large

25   home in Illinois and move into a four-bedroom three-bath home

in Scottsdale, Arizona, that she describes as "modest."  Most

poignantly to this Court, she also argues that with this

conviction she will be unable to adopt a child and enjoy the

blessings of raising a family.

     But she alone controlled her fate.  When the

government first began to investigate this matter, she could

have answered their questions forthrightly.  But instead of

honestly responding, she lied to the government, engaged in a

pattern of deception.  She could have avoided her costs by

admitting her guilt.  So, the financial costs associated with

this entire exercise should be shouldered by her.

     At least she has finally come to terms by taking

responsibility for her criminal conduct.

     Ms. Guerin argues in her brief that this Court should

"consider those who avidly pursued tax shelter business or who

willingly entered tax shelters but who were not charged with

any crime" and "that she was brought to the justice system even

as many others escaped that outcome."  But those assertions

underscore the importance of general deterrence for tax shelter

fraud.

     Ms. Guerin, like others involved in this conspiracy,

could have assisted the government in its investigation.

Instead, she hindered the government.  While many taxpayers may

have escaped criminal liability, they, too, are paying a price:

Taxes, penalties, attorney's fees, and the threat of criminal

D31rgue9

1    prosecution.  For many of the individuals she refers to,

2    though, their gambit may have paid off because Ms. Guerin and

3    others facilitated their crimes.

4        At bottom, Ms. Guerin's arguments underscore the

5    strong need for a significant sentence.  Looking at the 3553(a)

6    factors, the crimes here are very serious and there is a

7    compelling need for general deterrence and a need for specific

8    deterrence.

9        Ms. Guerin's childhood began in modest circumstances.

10   Her mother and grandmother sacrificed everything for her.  Her

11   grandmother retired from her factory job, moved into their

12   bungalow, and helped raise her.  Her mother worked in an

13   administrative job to make ends meet.  They did everything for

14   her.

15       Guerin's trajectory through childhood, college, law

16   school, graduate school, and on to a law firm can fairly be

17   characterized as the embodiment of the American dream.  She

18   excelled at school, went to college on a scholarship, became a

19   CPA and a lawyer.

20       But then her lust for money -- and that is the only

21   way I can describe it, her lust for money -- turned her

22   American dream into a nightmare.  Apparently, earning a couple

23   of hundred thousand dollars a year in Chicago was not enough

24   for Ms. Guerin as a young lawyer in her 30s.  She had to have

25   more.  Not just an incremental increase in compensation or a

1    bonus, but a quantum leap of millions more.  In the year 2000,

2    the year she turned 40, she earned $11,540,795.  But it was all

3    fraud, and she knew it.

4            As stunning as her multimillion-dollar compensation

5    was, it apparently wasn't even enough.  She had an agreement

6    with her co-defendant Daugerdas to get a little more even if it

7    meant defrauding her law partners.  It's the modern day

8    equivalent of Hawthorne's version of the story of Midas.

9    Everything she touched turned to gold with tragic consequences.

10   Looking at Ms. Guerin, her fall has been Faustian.

11           While her family offers touching vignettes about her

12   in their letters, they are not much different from what this

13   Court sees from many defendants who are far less educated and

14   well off.  Her mother writes that she is "very afraid that

15   she's going to need Donna's help and she won't be there for

16   me."  But Ms. Guerin forfeited the right to be by her mother's

17   side because of her greed.

18           For Ms. Guerin, it apparently has always been about

19   the money.  Even with all the money she amassed, there's not a

20   single letter submitted to the Court on her behalf showing any

21   meaningful commitment to public service or charity beyond her

22   college sorority that encompassed activities like driving an

23   elderly alumna to a reunion celebration.

24           Then, there is the letter from Barry Nekritz, a law

25   partner at SNR Denton, who was a tax shelter client of Ms.

Guerin's.  The government reports that Ms. Guerin engineered a

tax shelter for Mr. Nekritz that generated $600,000 in

fraudulent losses on his own tax returns.

It's no wonder that Mr. Nekritz writes of Ms. Guerin,

and I quote, "She knew the law and never varied from it," "She

always displayed the utmost in ethical conduct," and "If you

have a secret but want to get it off your chest, you can tell

it to Donna, knowing it will never go further.  I would trust

her with anything as her integrity in my opinion is beyond

reproach."  Spoken like a true co-conspirator.  Of course, only

the government knows why Mr. Nekritz wasn't prosecuted, but his

letter sets a new high watermark for chutzpah before this

Court.

In short, there are very few mitigating circumstances

here, just unchecked avarice.  It is against that backdrop that

the Court is prepared to impose sentence on Ms. Guerin at this

time.  I'd ask her to stand.

Ms. Guerin, in my remarks to you I've tried to make

clear what I have gathered from so many weeks of trial and so

much time spent on this case.  You had everything and you

squandered it.  You must be punished.

It is my judgment that you be sentenced to a term of

96 months of imprisonment, to consist of 60 months with respect

to Count One and 60 months on Count Two, of which 36 are to run

consecutive to the term of imprisonment on Count One.  I am

D31zgue9

also imposing a 3-year term of supervised release on you, to run concurrently on both counts.  The order of forfeiture in the amount of 1,600,000 has been imposed.  I am imposing the mandatory special assessment of $200.  I am not imposing any fine in this case, because that would be an exercise in futility.

I am imposing all of the standard conditions of supervised release and the following special conditions:  That you will provide your probation officer with access to any requested financial information; that you will not incur new credit card charges or open additional lines of credit without the approval of your probation officer unless you are in compliance with your installment payment schedule.

I am fixing an installment payment schedule that you are to pay 20 percent of your gross income upon your release toward the amount of restitution that I have ordered.  I am also going to require you to make a $200,000 payment toward restitution prior to the time that you begin to serve your sentence.  You have moneys to be able to do that, in this Court's view, so it will be done.

This constitutes the sentence of this Court, Ms. Guerin.

I advise you that to the extent you have not previously waived your right to appeal, you have the right to appeal.  I advise you further that if you cannot afford

1    counsel, counsel will be provided to you free of charge.  Mr.

2    Rotert has done an admirable job in representing you throughout

3    the proceedings before me.  I am confident that he will advise

4    you further with respect to your rights.

5                You may be seated.

6                Are there any further applications?

7                MR. OKULA:  Yes, your Honor.  We respectfully move to

8    dismiss the outstanding counts in S3 against Ms. Guerin.

9                THE COURT:  The government's application is granted.

10               MR. OKULA:  We also have no opposition to a voluntary

11   surrender upon either a date set by the Court or upon

12   designation by the Bureau of Prisons.

13               THE COURT:  Mr. Rotert?

14               MR. ROTERT:  Your Honor, I respectfully ask the Court

15   to assign a surrender date of Tuesday, May 14th, for Ms.

16   Guerin.

17               THE COURT:  I will do so.

18               MR. ROTERT:  I know that from one of the transcripts

19   that was provided to me, it isn't the Court's usual practice,

20   but I am going to respectfully request it.  There is a women's

21   correctional facility very near to where Ms. Guerin currently

22   resides.  It's called SPC Phoenix.  I'd be grateful if the

23   Court would recommend it to the BOP.  I know that no one knows

24   how effective, but it would be helpful if your Honor would

25   recommend that.

1        THE COURT:  I am going to recommend that specific

2   facility in Ms. Guerin's case provided that the Bureau of

3   Prisons believes that it conforms with her security

4   classification.

5        MR. ROTERT:  Your Honor, I'm going to respectfully

6   request that the Court reconsider the $200,000 restitutionary

7   payment obligation before she begins serving.  I ask the Court

8   to reconsider that in light of the corrections that the Court

9   has accepted to the pre-sentence report.  I do believe that

10  that is going to require her to cash IRAs and to take some very

11  difficult -- I'm not even confident that she will be able to at

12  that level, but I would respectfully ask the Court to

13  reconsider that, so I so move.

14       THE COURT:  Does the government wish to be heard with

15  respect to that application?

16       MR. OKULA:  Your Honor, we don't think that the

17  direction that your Honor gave was inappropriate, and we leave

18  it at that.

19       THE COURT:  I am going to decline your application to

20  reconsider that, Mr. Rotert.  I remain convinced that she will

21  find a way.  Earlier, among other things, you told me about all

22  the art they acquired, and they still have art.

23       MR. ROTERT:  It's been liquidated.

24       THE COURT:  There's $80,000 of art listed on Mr.

25  Guerin's --

 1           MR. ROTERT:  They have been trying to sell it, Judge.

 2    They can't find a buyer for it.  They have been trying to sell

 3    it for the last several years.  Your Honor, I appreciate that

 4    the Court's feelings are very clear and I respect and don't

 5    mean to be difficult.  We got to this 1.6 million number and

 6    the restitution on top of that, I appreciate.  But that was a

 7    number that we worked through after laying everything open to

 8    the government.  $200,000 is --

 9           THE COURT:  I know you laid everything open to the

10    government.  But the government itself acknowledged earlier

11    that despite their investigative efforts, despite their grand

12    jury subpoenas addressed to the trust, they weren't able to

13    find where things went.  I end where I began with my duty to be

14    skeptical of a fraudster of this magnitude.  I'm confident that

15    Ms. Guerin will find a way.

16           This matter is concluded.

17           (Adjourned)

18

19

20

21

22

23

24

25